810 A.2d 1086 (2002)
355 N.J. Super. 444
C&J COLONIAL REALTY, INC., a New Jersey Corporation, and John E. Long, Plaintiffs/Respondents-Cross-Appellants,
v.
POUGHKEEPSIE SAVINGS BANK, FSB, a New York Chartered Bank authorized to do business in New Jersey, Riverdale Timber Ridge, Inc., a New Jersey Corporation, and Rock Creek Crossing, L.L.C., a New Jersey Limited Liability Company, Defendants/Appellants, and
Melvin Herzberg, Kenneth L. Herzberg, Robert W. Burkett, and Hugh H. Shull, Jr., Defendants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 8, 2002.
Decided December 4, 2002.
*1088 Scott K. McClain argued the cause for appellants (Winne, Banta, Rizzi, Hetherington, & Basralian, attorneys; Mr. Rizzi, of counsel and on the brief).
Ernest R. Nuzzo, Mahwah, argued the cause for respondents/cross-appellants.
Before Judges STERN, COLLESTER and ALLEY.
*1087 The opinion of the court was delivered by COLLESTER, J.A.D.
Defendants Poughkeepsie Savings Bank (the Bank), its subsidiary, Riverdale Timber Ridge, Inc. (Timber Ridge), and Rock Creek Center Crossing, L.L.C. (Rock Creek), appeal from an amended judgment entered following a bench trial against the Bank, its successors and assigns, and Rock Creek in the amount of $135,000 to plaintiffs, C & J Colonial Realty and John Long (together "plaintiff"), as a five percent commission on the closing of the sale by the defendant bank to defendant purchasers Rock Creek.
Defendants argue plaintiff's action was barred by the statute of frauds. Moreover, they claim that even assuming compliance with the statute, plaintiff did not satisfy the requirement for a commission of producing a purchaser for a net sale price of $3,000,000 and that the only parties introduced to the property by the plaintiff were not part of the ultimate purchasing entity. They further contend that in any event the five percent commission awarded by the trial judge was inconsistent with both the proofs and the statute of frauds.
Plaintiff cross-appeals. He argues that the trial judge erred in awarding a commission of less than ten percent, in denying entry of judgment against defendants who were individual investors in the project, from the denial of his claim for punitive damages and from the denial of prejudgment interest.
The facts adduced at trial included the following. As the result of foreclosure *1089 proceedings, in 1991 the Bank, through its subsidiary Timber Ridge, became the half-owner of an abandoned and partially completed condominium development on a forty-four acre parcel located along the I-287 corridor in Riverdale, New Jersey. The remaining fifty percent of the property was owned by the Resolution Trust Company (RTC). The land contained two "pods" of boarded up townhouses, another boarded up building, and a large hole in the ground where construction had begun on a retention basin.
In May 1995, plaintiff Long became aware of the status of the property and called Sten Sandlund, the contact person for the property at the Bank, to advise that he was a real estate broker and a minor developer of property. Sandlund told Long that no real estate signs had been placed on the property as yet because the Bank did not own it free and clear and thereby could not convey title. Long acknowledged that Sandlund also told him the Bank was not going to list the property with a broker because the property had already elicited substantial unsolicited interest from developers and the Bank had been successful in selling properties directly. Additionally, the Bank was contemplating whether to develop the property.
Long told Sandlund that he wanted to introduce the property to some people he worked with on an ongoing basis "to see if we have the capability financially or otherwise to buy it from you." Sandlund said that would be fine but that the bank would "not take a dime less than three million dollars." Long understood that figure to be "an absolute bottom" after payment of commission and that, even if a purchaser was produced, the bank would not enter into any arrangements unless the buyer could show the financial ability to pay at least one-third of the price, $1,000,000, in cash up front.
Sandlund invited Long to send him a letter with his business card requesting the sales information package for the property. According to Long, when he asked if he could visit the site, Sandlund said "sure, be my guest."
On June 2, 1995, Long faxed Sandlund a handwritten note that said:
As we discussed yesterday would you please send me [illegible] information packaged on Timber Ridge Town homes Project.
 Please send to: C & J Colonial Realty
 c/o John Long
 34 Aspen Road
 Ringwood, N.J. 07456
I may be a principal in a group to buy the project but failing that I will offer it out at 3 million plus my commission to preserve the bank's net figures desired. Thank you.
Long never received the sales package. He also admitted that when he wrote the June 2, 1995, letter he was unsure what he would charge for a commission because he was more interested in becoming a principal in purchasing and developing the property and was not sure it was worth $3,000,000.
Long visited the property with his builders, but they were either uninterested or unable to meet the Bank's requirement of $1,000,000 cash up front. Nonetheless, Long testified that his examination of the property confirmed his opinion that the existing portions of the project were well built and would be able to absorb a ten percent commission at the $3,000,000 price. Long therefore resolved to show the property to potential buyers. He contacted various developers from the yellow pages and placed advertisements in newspapers. He required all of his potential purchasers who viewed the property to sign a "notice of showing" or verification of property inspection *1090 which stated that Long had the seller's authorization to offer the property and that the seller would pay the commission. At no point did Long send copies of these notices to the Bank.
From June 10 to July 14, 1995, Long unsuccessfully attempted to reach Sandlund, who did not return his calls. As a result, Long decided to write Joseph Tockarshewsky, the Bank's chairman, president, and chief executive officer. In a handwritten letter to Tockarshewsky dated July 14, 1995, Long stated:
As of this date my office has shown the bank's property known as Timber Ridge in Riverdale, N.J. to Catton Homes of Manalapan, NJ, Mr. Robert Fecso, Division Land Manager, Haseko Realty Inc. of New York and New Jersey, Mr. Allan Leeds, Director of Marketing of Avalon Properties, Inc., Princeton N.J. and Mr. Jeffrey Albert, Acquisitions Director.
I had quoted a purchase price of $3.5 million for the project, inclusive of a commission to our office of $300,000 netting to the bank $3.2 million as we had discussed earlier.
These gentleman may contact you directly to discuss the project, request the information package on the project or attest to their financial ability to purchase the project [illegible] my office would like the information package as well [illegible] to serve as an introduction to these potential buyers and as a [illegible] of showing the property to them by my office. Please copy me with any [illegible] that my [sic] transpire between you and them. Thank you for your cooperation.
Long explained that he sent the letter because he had concluded: "I better let him know now my role is going to be that as a full-fledged broker in this deal and I wanted to alert him that what my activities consisted of was that I was now going to quote this price, namely three-point-five million dollars and I was going to go for the 10 percent commission ..." He added that he also sent the letter both to satisfy the statute of frauds and to determine if the bank was "really going to work with me or not."
Also in mid-July 1995, Long purchased $100 worth of the Bank's stock for the stated purpose of creating an ownership interest and because he had
detected a little animosity from Mr. Sandlund toward brokers in general, and I got the implication, at least my sensitivities led me to believe that this guy was going to be trouble, even if I sold the property for them, so I decided to become a shareholder in case they did anything wrong from a shareholder's point of view maybe I could sue the butt off them.
On July 27, 1995, Tockarshewsky responded to Long's letter as follows:
Thank you for your July 14, 1995 letter concerning the subject property which I gave to Gus Costaldo, Senior Vice President, Special Assets Group.
Both Gus and Sten Sandlund are responsible for managing and marketing this asset. In that regard you have not been given authorization by anyone at PSB either verbally or in writing to show this property to a prospective purchaser. Any sale is subject to the approval of the Board of Directors of Riverdale Timber Ridge, Inc., its participant, in their sole and absolute discretion.
This letter does not constitute a listing of the property with you or your company. If you would like to arrange a meeting with any of the developers you mentioned in your letter under these terms, please call Gus or Sten at (914)431-6347 or 431-6004 respectively.
*1091 Long concluded from Tockarshewsky's letter that he "didn't kn[o]w what he was talking about" and that Sandlund was the guy in charge.
Long testified that before he received Tockarshewsky's letter, he had arranged to show the property to Milton and Kenny Herzberg on July 27, 1995. Milton Herzberg was in his seventies, and Kenny, his son, was in his mid-forties. They responded to Long's newspaper advertisements for the property and signed a notice of showing by Colonial Realty indicating they had visited Timber Ridge and another property with Long. The notice stated:
While it is expected that the sellers of these properties will pay any sales commission due C & J on a sale that takes place to us, the undersigned agrees to assist and protect C & J's right to that commission by signing this notice of showing.
The undersigned also agrees not to disclose or discuss these properties with others, especially other real estate offices without C & J's approval since it might interfere with or confuse C & J's claim to a commission jointly with such other offices.
The undersigned further agrees that if they form or use any other subsidiary or entity to purchase, lease or trade for the property it will be as if the undersigned in fact obtained the property and they agree to inform the sellers of the properties of that fact throughout their negotiations with the sellers if they act independent of C & J Colonial Realty Inc. for whatever reason.
The undersigned has been informed that C & J will claim a ten percent (10%) commission on a sale of either property and that C & J will be specified as the procuring broker in these transactions. C & J will be updated and copied on all negotiations and correspondence with the sellers who may actually prefer direct dealings with principals and in this regard C & J has no objections.
Long provided the Herzbergs with Sandlund's name and telephone number, and informed them of the Bank's financial requirements. Sandlund met with Milton Herzberg who described himself as a "syndicator" who raised investment capital, and presented himself as someone with development expertise and substantial capital. He claimed to have taken over a failed townhouse project in Old Tappan and brought it to a successful completion.
While there was conflicting testimony as to whether the Herzbergs were accompanied on their first site visit by Hugh Shull, there is no dispute that Shull visited the site with the Herzbergs in July or August." Shull was a retired corporate counsel who acted as the financial manager for a group of real estate investors headed by Wilton Hawkins, and also included John Arwood and Tom Peacock. These investors were close friends as well as business partners. They had completed a real estate development project in Clifton, New Jersey in 1994, and subsequently became involved in a project in North Carolina. The group's general contractor for both projects was Robert Burkett. These men, plus various others who had participated in the North Carolina project, were referred to generally throughout the trial as "the North Carolina group."
One of Hawkins' closest friends was a man named Carter Bacot, the long-time chairman of the Bank of New York, who also was friendly with Shull. Bacot's daughter was married to Milton Herzberg's other son. At the wedding of one of Bacot's daughters, Herzberg met Hawkins and told him about the Timber Ridge property. Hawkins called Shull and Burkett, who was still in North Carolina, and asked them to contact Herzberg because *1092 Herzberg had some land and needed a builder. Neither Shull nor Burkett ever heard of Herzberg before Hawkins' call. During subsequent telephone conversations with Burkett, Herzberg represented himself as the principal developer of a number of projects in New York and New Jersey and was interested in the Timber Ridge property. Burkett testified that he already was aware of the Timber Ridge project because he had seen it when the group was investigating other distressed RTC-owned properties.
Shull met with Herzberg at Shull's New York apartment prior to visiting the site. Herzberg told Shull what he had told Sandlund, namely, that he was a real estate developer who had been a principal in a townhouse project in Old Tappan that had been successful. He added that the project was selling out, and he and Kenny were looking for other investment opportunities. Shull drove out to the site with Milton and Kenny. He could not recall whether Long was present during this visit. Shull reported to Hawkins that he did not feel qualified to properly assess its potential. Hawkins told him to have Burkett look at the site.
On August 5 or 7, 1995, Burkett flew up from North Carolina and visited the site with Shull, the Herzbergs, and Alex Zepponi, a civil engineer who came with the Herzbergs. Long was present at this meeting and was introduced to Burkett and Shull as the broker. However, Long had no information on the property with the exception of an old site plan. When Burkett told Long that he had seen the property a year and a half earlier with a realtor from Coldwell Banker, Long claimed to be the exclusive broker with a listing from the Bank and the Bank was paying his ten percent commission. Burkett said he asked to see the listing agreement because he thought it unusual for a bank to pay such a high commission and give an exclusive listing to a one-person brokerage company. He never received any such listing from Long.
During the site visit, Burkett and Zepponi saw that certain visible elements of the project's infrastructure were "stubbed" or false. When they pried up manhole covers, they discovered the holes underneath were only three feet deep. At one point, Burkett leaned against a fire hydrant, and it fell over.
After the site visit, Burkett, Shull, the Herzbergs and Zepponi went to Zepponi's office, where Burkett telephoned Sandlund. Sandlund met them that afternoon and provided a complete information package, including engineering reports. He told the group that the project was not for sale as yet because the Bank and RTC still were negotiating over which one would buy out the other. Sandlund told them the price was $3 million but did not mention a requirement for $1 million up front. When Burkett asked Sandlund about Long's claim that he was the exclusive broker for the property, Sandlund responded that Long "wasn't really involved" and that the Bank did not have any agreement with him.
Sandlund had been under the impression from the Bank's engineering report that the infrastructure on the property had been completed. However, at a meeting the following day with Burkett and the Bank's engineer, they discovered a number of buried fifty-five-gallon drums that were full of dirt and smelled of fuel oil. They met with the chief of police, obtained plans from the township engineer, and made an appointment to see the township attorney the following month. Long was not present at any of these meetings.
Sandlund was impressed with Burkett's enthusiasm for the project as well as his representations of his ability to work a heavy rock site because the mountainous *1093 and rocky topography and the water which had collected in the holes from previous blasting presented "tremendous physical challenges" to development. Sandlund believed the Bank had found "the right guy" for the physical part of the site. He also agreed after inspecting the property with Burkett, that the $3 million price was not feasible.
On August 7, 1995, Fred Schlesinger, the attorney for Timber Ridge, wrote to Long, with a copy to Sandlund:
This firm represents the above company, which is co-owner of certain property in the Borough of Riverdale. Notwithstanding your letter to Mr. Tockarshewsky of July 14, 1995, and without authority you have represented to certain potential purchasers that you have authority to show this property. You have no listing agreement. Without such a listing, the owners are not obligated to pay you commission, no matter how many telephone calls or letters your [sic] may sent to my client alleging that such a listing exists.
If you wish to negotiate a listing agreement with my client, please send it to me and I will present it to them at such time as is appropriate.
At this time, my clients are entertaining several previous offers with reference to the project, which negotiation will have to conclude before we will entertain a listing agreement with you or your company. You are instructed to cease future activity with reference to this property, proportedly [sic] on my client's behalf.
On August 17, 1995, Long wrote back to Schlesinger, with a copy to Sandlund:
In response to your letter of August 7, 1995 I would like to request an exclusive right listing on Timber Ridge at Riverdale, New Jersey to represent Poughkeepsie Savings Bank (PSB) in selling the property. While this request is pending PSB's decision, I would simply like formal authorization from you to offer the property for sale on an open-listing basis whereby I only get paid if my customer buys the project and where the PSB can sell it themselves and not be obligated to me at all if they do.
In my earlier discussions with Mr. Sten Sandlund I believed I had that authorization and acted upon that belief and offered it to several potential buyers as per my July 14th letter and since then to others listed below.
At Mr. Sandlund's direction I have quoted a $3.5 million dollar price so as to preserve PSB's desired net of $3 million dollars, and if PSB gets $3.5 million from my buyers and I take $300k for a 10% sales commission they would net $3.2 million and the deal would more than satisfy PSB's requirements.
At least two of my potential customers; [sic] Melvin Herzberg of Melvest Company, New York, N.Y. and Mr. Allan Leeds of Haseko Realty, New York, N.Y. are actively reviewing various data and market research that I have supplied to them and I believe when PSB opens the opportunity they will make offers. I have agreements with these buyers that they will make these offers through my office and that in any interim discussions, they were to make PSB aware that my office was the procuring office in bringing the deal to them, and that my office was seeking a 10% commission on the deal.
I also offered these buyers the opportunity to deal directly with PSB and that they pay my commission but they did not favor that arrangement. A suggestion is that you, or PSB, make that a requirement of them and others in order to "level the playing field" for everyone *1094 and then they either comply or get out of the game.
I think Timber Ridge has great promise as a project in the hands of the right developer and my interest is to get PSB the highest and best deal so I offered it at $3.5m. I know that PSB is interested in getting the highest price for the property for its stockholders and I think that rather than the order in which the buyers show up being very important, it is more important to get their offers in to the bank to find out who is the best buyer for the project and the bank.
I have always been up front and followed through on discussing with the bank representatives. In return I ask for this listing authorization and recognition and protection of my 10% commission as the procuring broker for any offers coming in from these prospective buyers as noted now and in my July 14th letter. Also, I would ask again for the information package, Mr. Sandlund originally promised me when we first talked in June.
Long explained that he wrote to Schlesinger because he "wanted to make certain, minimally, they got the message of what I was doing on their behalf and to continue to let them know I was expecting the commission."
Sandlund testified he then instructed the Bank's attorney to send Long a letter saying, "stay away from the property and if either Melvest or Hasako acquires the property, then we'll work with you." He described it as a "get-out-of-our-hair letter" to say: "[S]top pestering us. Stop shotgunning the property all over the market. You have no authority to represent us.... [I]t specifically says go away and we will negotiate in good faith with Melvest and Mr. Leeds, and if something comes up, that we'll get back to you." Sandlund recognized that if Herzberg bought the property Long would "get something." He also assumed that Long was a residential broker because his claims for a ten percent commission on a $3 million dollar commercial asset sale gave the impression that Long "really didn't know what he was talking about," and that the ten percent commission was "probably triple what anyone would pay."
In accordance with Sandlund's direction, Schlesinger wrote to Long on August 21, 1995, stating the following:
Responding to your letter of August 17, 1995, purportedly in response to my letter of August 7, 1995, I don't think you got the point of my letter. The point is that absent a Listing Agreement, there is no relationship between Riverdale Timber Ridge, Inc. and your company. My clients do not want you shopping their property generally. They are dealing with other buyers and other brokers and do not want your company meddling in their ongoing transactions.
My clients will consider offering you a listing agreement with respect to particular individuals whom you identify.
You are to cease showing the property to any other individuals without having a listing agreement. With respect to the individuals to whom you have shown the property, my clients will recognize you with respect to Mr. Leeds and Mr. Herzberg. That is it. If you want to show the property to someone else and if we authorize you to do it we will do so by giving you a listing, which is what I think you want in order to protect your right to a commission.
Schlesinger testified that this letter meant that if Herzberg bought the property, then the Bank would negotiate a commission with Long. However, Long testified that on receiving this letter, he "felt secure in knowing that they'd pay me if Herzberg or Leeds brought the property" *1095 and that "they recognized me under my previous letter terms of 10 percent commission, period."
Through the fall of 1995, Sandlund, Burkett and Shull proceeded with preparatory plans to purchase the property. In September, they met informally with the planning board. Burkett was in daily contact with the town attorney regarding approvals and he attended "virtually every Planning Board meeting" thereafter. He and Shull continued to investigate other properties in the area as possible development projects. Neither Long nor the Herzbergs were present at any of these meetings. However, Burkett and Shull had a series of meetings with the Bank regarding the terms of the deal, and the Herzbergs attended several of those meetings.
In December 1995, Milton Herzberg introduced Shull to attorney Joseph Rizzi who had been the attorney on the Old Tappan project. Burkett and Shull hired Rizzi in February 1996, as the group's attorney for the Timber Ridge project. Rizzi knew that the Herzbergs hoped to become an equity partner with the North Carolina group. Moreover, Shull, Burkett, and Sandlund had all assumed that the Herzbergs would be principals in the deal and part of the purchasing group because Milton Herzberg represented that he already had fifty percent of the necessary money, including his own contribution, and he was looking for additional investors. Gradually, however, it became apparent that the Herzbergs' representations regarding their real estate and development experience, and their financial resources, were completely false. At the first meeting at the site, Kenny had represented himself as a broker in New York City but, in fact, neither he nor his father were licensed. Burkett was suspicious of their claims because Milton Herzberg had claimed to be a principal in the Old Tappan project, but he did not know the project's costs or sale price and had no understanding of the process for obtaining local government approvals. Zepponi then informed Burkett and Shull that the Herzbergs had played no active role in the Old Tappan project. Thereafter, in late 1995 or early 1996, Shull obtained a Dun and Bradstreet report on Herzberg, which Shull described as "pretty gruesome," with a listing of significant amounts of unpaid debt and judgments. When confronted, Herzberg confessed that neither he nor Kenny had jobs and were in desperate financial straits.
In addition to the revelations regarding the true nature of the Herzbergs' situation, Shull and Burkett began to realize that Kenny's personality presented problems. While Milton Herzberg was "a nice gentleman," Shull described Kenny as someone with "a lot of bluster with no substance, a troublemaker." Burkett had formulated a list of marketing and sales related tasks for Kenny, but he would not do them. By the end of the year, Shull and Burkett realized that they would not be relying on any skills or resources of the Herzbergs to carry out the deal.
But despite the revelations about the Herzbergs, their relationship with the project continued. Shull understood from Hawkins that the Herzbergs' familial relationship with Bacot and Bacot's close friendship with Hawkins required that the Herzbergs be treated "fairly." Shull and Burkett endeavored to find a role for the Herzbergs as "hired hands." Burkett's contract made him responsible for marketing the project, and Burkett and Shull decided they might find a role for the Herzbergs in marketing and advertising the property, and staffing the sales office. Shull worked with the Herzbergs on preparation of a marketing plan and budget for the bank's approval as part of the closing.
*1096 Long also worked with Burkett on marketing aspects of the project. In hopes of obtaining the right to a referral fee on each finished condominium unit, Long attempted to locate a real estate brokerage company large enough to staff the sales office. Long testified that he met with Burkett four times at real estate offices, two or three times at advertising offices, and once at the Century 21 training facility. These were the only meetings Long had with Burkett. He admitted that about eighty-five percent of his time on the project was spent attempting to obtain the authority to co-broker the aftermarket, or completed units, and he kept no documentation of the hours he worked on the project.
When Burkett informed Long in January 1996 that the Herzbergs would not be participants in the purchase, Long accused Burkett of trying to beat him out of his commission. When Burkett also told Long that Sandlund indicated Burkett's group might be able to buy the property at $1.7 million, Long testified that he said to himself, "I better ... get the price up." Long felt that he had "no obligation" to Burkett's group to discontinue showing the property because he "was not privy to a contract." Two months later on March 28, 1996, the Bank's attorneys wrote yet another letter to Long stating that he was not authorized to show the property and to cease doing so. However, Long continued showing the property until June 1996.
In February 1996, RWB Associates,[1] through Burkett and Shull as "authorized representatives of the buyer," entered into a fee-based premobilization agreement with the Bank to investigate the status of the infrastructure, to bring the condition of the project to the point that it had appeared to be on paper, and to complete the infrastructure. The agreement required the Bank to remove the property from the market and grant the buyer the exclusive right to purchase.
On February 12, 1996, the Bank's attorneys faxed to Kenny a proposed agreement of sale, in which Herzberg was listed as a principal in RWB Associates, along with Burkett, Shull, Hawkins, Arwood, and Robert Gilroy, Jr. The purchase price was stated as $2,275,000. The draft contained a paragraph entitled "Brokers," which stated: "Buyer and Seller represent and warrant that neither has dealt with any broker in connection with this sale other than C & J Colonial Realty, Inc., of Ringwood, New Jersey, to whom Buyer is responsible for payment of a real estate commission." Shull responded on February 20, 1996, with initial comments that indicated the document required a "proper description of parties." As to the section on brokers, he noted:
Originally bank to take care of any broker. We were told they had no listing agreement.
Later the bank said they wanted us to handle. See correspondence. We need to address this problem.
On March 5, 1996, Rizzi was hired as the group's attorney, but Milton Herzberg and Kenny refused to sign the retainer agreement. Rizzi explained that the experience was a "deja vu" repeat of his two previous experiences with the Herzbergs, including the Old Tappan venture, in which Rizzi had acted as the attorney for a group of purchasers, and the Herzbergs had attempted to become an equity partner in a business venture and be included in purchase negotiations on the strength of *1097 representations that they would bring in various financial resources and additional investors. In both instances, at the last minute, the other members of the purchasing groups discovered that the Herzbergs were unable to contribute either the financial resources or relevant experience that would support their demands to participate as equity partners. Shull and Burkett learned that, at the same time the Herzbergs refused to become financially responsible parties on the retainer, they were representing themselves as partners and had attempted to hire people for the project. At Burkett's request, on April 9, 1996, Rizzi's law firm sent Herzberg a letter that stated:
The principals of the Project wish to make it clear to you and Kenny that no firm decision has yet been made as to the nature of the role Melvest, you and/or Kenny will have regarding the marketing and sales of the Project. The principals further wish to emphasize that you and Kenny do not have the authority to represent yourselves to any third parties as the developers of the project or agents of the developers or in any way bind the developers to any agreements or contracts without their express written approval.
Rizzi described Kenny's reaction to this letter as "absolutely frightening." At a meeting on May 3, 1996, Kenny threatened to see to it that the relationship between Hawkins and Bacot ended and to make trouble with the town. He also threatened to sue. Milton Herzberg pointed out that the North Carolina group knew that he and Kenny were financially desperate, that they had introduced the group to Zepponi and Rizzi, and had done a substantial amount of leg work. The decision was made to pay the Herzbergs a certain amount of money for their efforts which would be determined by Hawkins.
The property was sold to Rock Creek Junction on June 27, 1996, for a total price of $2,710,000, with $1 million paid in cash and the balance financed by loan. Hawkins and Peacock guaranteed repayment of the loan and completion, and Shull acted as guarantor for completion only. The agreement set forth that neither buyer nor seller had dealt with any broker other than Colonial Realty and Long, and the buyer agreed to indemnify the Bank for any commission claim by Colonial Realty or Long, and for related attorneys' fees. The Bank insisted on the indemnification provision. All the parties were aware of Long's claims, but Rizzi, Shull and Sandlund each had concluded that his claims were specious.
On August 19, 1996, Rock Creek signed an agreement with Milton Herzberg to pay him $26,666.67 upon execution of the agreement, plus an additional $3000 for out-of-pocket expenses upon execution of the agreement, and thereafter to pay him $6,666.67 per month for the next seventeen months, in addition to $50,000 within thirty days of the closing on the sale of the last condominium unit at Timber Ridge. As part of the agreement, Milton Herzberg agreed to indemnify Rock Creek against any claims by Colonial Realty or Long. Based on his situation with various creditors, at his request Kenny Herzberg was not part of the agreement.
Milton Herzberg eventually received approximately $78,000 to $90,000 pursuant to the agreement. When Long brought his lawsuit, however, Shull stopped payment to Herzberg because he knew that Herzberg had no other way to service his obligation under the agreement to indemnify Rock Creek for any claims by Long. Rock Creek then paid Herzberg $15,000 to be released from the agreement.
On January 27, 1997, C & J Colonial Realty and John Long filed the complaint *1098 alleging plaintiff was owed a commission of $297,058.15 on the sale of the property owned by the Bank and its subsidiary Timber Ridge to Rock Creek. Named as individual defendants were Milton and Kenny Herzberg, Robert Burkett and Hugh Shull, Jr., on the allegation that they conspired to preclude payment of the commission. Specifically, the complaint alleged that defendants were jointly and severally liable to plaintiff: under the terms of a brokerage agreement (count one); for services rendered based upon defendants' promise to "pay the agreed amount as set forth in the brokerage agreements" (count two); for "the reasonable value of the services rendered" based upon defendants' promise "to pay a reasonable price for such services" (count three); because defendants were "indebted to the Plaintiffs in the sum of $297,058.15, an amount set between the parties" that defendants promised to pay upon closing (count four); because defendants "unlawfully conspire[d]" to defeat plaintiff's rights and to defraud him of his commission (count five); because defendants intentionally and maliciously acted to circumvent plaintiff's rights to compensation (count six); because unspecified defendants tortiously interfered with plaintiff's contract rights under his agreements with "Defendant Bank" (count seven); because plaintiff had "a choate equitable lien on the premises" under which plaintiff sought a judicial declaration of his rights (count eight); because defendants received a benefit from plaintiff's labors and services and were liable under the doctrine of unjust enrichment (count nine).
On April 15, 1997, the Bank and Timber Ridge answered the complaint denying any commission was owed, an asserting that the action was barred by the statute of frauds. The answer included cross-claims for indemnification and contribution against Rock Creek based on the June 27, 1996 addendum to the parties' purchase and sale agreement. The same day defendants Rock Creek, Burkett and Shull answered plaintiff's complaint, asserting a claim for contribution and indemnification against Milton and Kenny Herzberg pursuant to "the Herzberg agreement."
After a thirteen day bench trial on April 20, 2000, the judge found in favor of plaintiff for judgment in the amount of $135,000 against Rock Creek based on a commission rate of five percent. No damage amount was fixed against the Herzbergs on the default judgment against them.
On June 23, 2000, plaintiff filed a motion for prejudgment interest and for reconsideration of the judge's decisions to enter judgment against Rock Creek but not the Bank and to enter no judgment amount against the Herzbergs, Shull or Burkett. The judge denied the motion for prejudgment interest and denied reconsideration of his decision regarding the Herzbergs, Shull or Burkett. However, he did amend the final judgment to reflect the Bank as jointly and severally liable with Rock Creek.
On August 22, 2000, final judgment in the amount of $135,000 was entered against Rock Creek, and the Bank and its successor Hudson United Bank. The written order denied plaintiff's motions for prejudgment interest and entry of judgment against the Herzbergs, Burkett and Shull. The final judgment makes no mention of Rock Creek's contribution and indemnification claims against Milton. The record contains no order dismissing the action against the Herzbergs, Shull or Burkett.
On October 5, 2000, the Bank, Timber Ridge and Rock Creek filed a notice of appeal. On November 6, 2000, plaintiff filed a notice of cross-appeal from the trial court's decision not to enter judgment against the Herzbergs, Shull, or Burkett, and its decision to award plaintiff only $135,000 rather than $300,000. On November 24, *1099 2000, plaintiff filed an amended notice of cross-appeal, adding appeals of the trial court's denial of punitive damages and prejudgment interest.
In addition to the testimony summarized above, there was testimony about the appropriate commission rate assuming plaintiff prevailed, although neither side presented an expert regarding industry commission rates. Sandlund testified that the typical commission paid by the Bank was two percent or two and one half percent, and the largest was four percent, which was warranted in that particular matter by a low purchase price. He added that the Bank had used a broker's services only on two or three of the ten or twelve sales it had accomplished in the prior two years, and in those instances, the Bank retained the brokers under written agreements which set forth the scope of services. Those agreements required the brokers to manage the properties on-site, find the buyers, structure the financing, do the legwork and obtain all the necessary documents for due diligence and facilitate the closing. Sandlund acknowledged that a "seasoned finance professional," who brought in a buyer and did all of the qualifying work to enable the Bank not to spend time on the property, might have received five percent to seven percent commission, but only on the million-dollar equity portion of this sale.
Sandlund explained that if Long had sent a listing agreement in response to Schlesinger's letter, the Bank would have provided a "buyer listing." Under a buyer listing, the broker was considered the buyer's agent and not the agent for the Bank or the property. The party responsible for the commission under a buyer's listing would differ depending on the circumstances.
Burkett explained that he usually handled the broker negotiations for the North Carolina group, and commissions generally were set on a sliding scale depending on the sale price. The broker's percentage would be reduced as the price rose. As an example, a broker might receive a five percent commission on a sale price of $100,000 to $500,000, three percent on $500,000 to $1 million, and two percent on $1 million to $2 million. According to Burkett, brokers rarely received a flat commission rate for sales of commercial property. Burkett also said that the broker for a property usually supplied complete information on the property, including aerial photos, plans, approvals, and drawings.
Testifying in support of his argument for entitlement of a ten percent commission, Long said that he first told Sandlund that his commission "could be five or ten" percent, and that Sandlund responded "I don't care what you charge." Long asserted that the commission on "raw land" was "typically ten percent" and that the rate depended on "how difficult the sale was going to be." He would not provide the court with any yardstick on the difference between what it would take to earn a five as opposed to a ten percent rate other than to say that it depended on "the perception of how much time it would be to find ... a buyer under the circumstances imposed by the seller ... how many hoops you had to jump through." Based on the rocky nature of the property and the need to find a qualified builder, Long "projected quite a bit of time was going to go into this deal and with that expectation of time, I figured, hey, let's make it worth my while at ten percent." Long figured that "[i]f [Sandlund] didn't care and the property was worth it, why shouldn't I take a ten percent commission."
In response to a question from the court, Long explained why he never sent Sandlund a brokers' agreement:
I had asked him about that. I said are you going to list the property, would you *1100 list the property with anyone? He says, no, we're going to sell it ourselves; he says that's my job. So he didn'the wasn't going to use a broker and he said he was giving only what they call open listings out. He said
THE COURT: What was your understanding of that?
THE WITNESS: The open listing was very clear in a sense: You bring me the customer and I'll pay you the commission. And I said, well, what's the commission going to be. He says you decide, he says how much do you want. It was just kind of, you know, just a free, verbal type conversation. There was nothing locking
THE COURT: All right.
THE WITNESS:either one of us in on anything until we were going to commit to it.
The judge concluded that Rock Creek was liable to pay plaintiff $135,000, representing a five percent broker's fee. The judge further found the money was due initially from the Bank, but the Bank had successfully shifted payment to the buyers in the closing agreements.
The legal basis for the decision is not entirely clear. The judge found that "[f]airness here requires the broker to be paid for introducing the prospective seller," and that he did not need to decide whether plaintiff was entitled to a commission on the basis of quantum meruit or unjust enrichment. At the same time, he found that the statute of frauds was fully satisfied by the series of correspondence. However, he also concluded that plaintiff was not entitled to a ten percent commission, which was the only commission amount referred to in that correspondence.
The factual basis for the judge's conclusions are also somewhat contradictory. The judge found that Sandlund told Long in their initial conversations that he "was not giving out any brokers agreements" because the Bank was actively marketing the property itself, and because the RTC still owned half of it and that, in any event, the Bank wanted to net three million dollars. The judge found that "it's clear throughout this entire case ... the Bank never had any intention of listing this with anyone because they had so many people interested in it, they were going to deal with the matter on a one-to-one basis, based on what actually somebody was going to bring concrete, and then they would talk commission." The judge then observed that Long's June 1995 fax to Sandlund "clearly confirms that there was discussion by the broker as to what he would charge" but that no one from the bank "wrote back in carefully [sic] language that is in accordance with the exact dictates of the statute of frauds on broker's commissions that they would pay this." Nonetheless, the judge concluded that "the events and the correspondence thereafter clearly, and unequivocally, and the total circumstances, and indeed the Bank's own witness said that, yes, if he procured it we would negotiate." The judge found that this arrangement constituted an open listing.
The judge specifically found that the Bank's obligation to pay was predicated on Schlesinger's August 21, 1995, letter. In discussing the impact of this letter, however, the judge observed that "Mr. Schlesinger says my clients will consider offering you a listing agreement with respect to particular individuals" but he also recognized that "the Bank had made it clear ... we weren't going to sign a listing agreement with anybody because they were looking for not only three million, but they wantedhaving been apparently bitten once, they were not going to take some fly-by-night outfit." Thus the Bank required a potential buyer "with a million dollars at least up front in cash." After these observations, the trial judge went on to state:

*1101 And of course, he closes with this paragraph. "You are to cease showing the property to any other individuals without having a listing agreement." A peculiar sentence since they were giving a listing agreement anyway. "With respect to individuals to whom you have shown the property, my clients will recognize you with respect to Mr. Leads (phonetic) and Mr. Hertzberg [sic]." That is it, and that is it in terms of the Bank's responsibility to pay this commission since I find that Mr. Hertzberg [sic] led to Mr. Shull, led to Mr. Burkett, led to Mr. Peacock, Mr. Hawkins, and the other ultimate group that formed the limited partnership. And the fact that Mr. Hertzberg [sic] was cut out of the deal for collateral reasons does not in any way defeat the broker's commission here, since it was always known from day one, by Burkett and Shull that they were forming a group, and indeed Hertzberg [sic] told them they were forming a group, and indeed Mr. Long thought that they would form a group, but he couldn't do it.
The judge found the letter to be an "unequivocal confirmation by the Bank through their attorney that Mr. Long would be recognized for a commission, although not stated specifically ... if, in fact, either one of two grouppersons that he introduced to the Bank would end up as the seller. And one of them was Herzberg."
As to the defense contention that Herzberg was not the buyer, the judge rejected that as "ludicrous since Mr. Herzberg was in this ... right up till late April or even May of the following year until his group told him he was out." The fact that Herzberg, Shull or Burkett were not part of the group that bought the property was "not a sufficient reason since it's so clear from the documents that there was going to be a group formed in some unit, partnership, or what have you" and that these individuals alternately were included and left out. While these comments appear to recognize the Herzbergs as legitimate partners in the purchase, the judge described Milton Herzberg as "nothing more than a fraud" and characterized him and his son as "unfortunately an impediment to any kind of collegiality among potential owners, and a real anchor in terms of trying to maintain a front for selling or otherwise marketing the project after they had bought it, to the point where he and his father had to be eliminated from the deal all together in a sense."
The trial judge specifically rejected plaintiff's contention that the money the group paid to Herzberg represented the commission that otherwise would have been paid to Long, finding instead real reason for the payment was to get rid of the Herzbergs. He opined that the group was forced to pay the Herzbergs because of their threats to complain to Bacot of mistreatment, which put the investors in a difficult position. However the judge later offered the following contradictory observation:
they were not so generous to just give this outright, they then shifted ... Mr. Long's commission to Mr. Hertzberg [sic], which as an afterthought confirms what the facts show, that Hertzberg [sic] was the connecting common denominator right to the end, and only through his own misrepresentations to the group, cut himself out. Had he been what he said he was, he would have been a partial owner, and the commission defense that the people that bought it were not the people that Long dealt with would have fallen as it does here.
The judge found that the July 27, 1995, acknowledgment of showing signed by the Herzbergs could not form the basis for obligating the buyer although it "could *1102 form a basis for an equitable lien." However, he made no finding that such a lien existed.
The judge's findings were also in conflict on the issue of whether Burkett and Shull were the ultimate purchasers. He stated that they "were not equity owners," and instead, Burkett was the "manager" and "Shull's job here was to watch out for the money of Hawkins and the group."[2] However, he also found that, if the project "was significantly successful" and the investors recouped their losses from the North Carolina deal, "there would be an opportunity for [Burkett and Shull] to receive whatever you want to call itprofit." Based on this arrangement, the judge found that Shull and Burkett "were equity owners ... in a de facto sense that if this is successful they would take additional monies out of it."
On appeal defendants first argue that plaintiff is not entitled to a real estate commission because there was no enforceable agreement between the parties in that plaintiff failed to satisfy any element of the statute of frauds and, furthermore, assuming that an agreement did exist, plaintiff failed to satisfy any of the agreement's terms so as to be entitled to a commission. Instead, they assert that plaintiff's claim is an impermissible quantum meruit award which must be reversed.
The trial judge found that the statute of frauds was "fully satisfied by the series of correspondence" because "[w]e don't need a single writing" and, even if there was a statutory failure, there was "no question" that Long was the efficient procuring cause of the purchase. The judge concluded that Long's "peculiar style" should not deprive him of the commission, "which I believe is due him because he introduced the purchasers to these people."
The purpose of the statute of frauds as it pertains to real estate commissions is "to protect the public from fraud, incompetence, misinterpretation, sharp or unconscionable practice[s]" by real estate brokers. Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 553, 236 A.2d 843 (1967). During the course of the parties' dealing, the existing statute of frauds was repealed and replaced by an amended version.[3]
*1103 Effective January 5, 1996, however, after the Herzbergs, Shull and Burkett were introduced to the property, but before the purchase was completed, the statute was repealed.[4]
Under both statutes the broker's right to a commission depends on whether his or her authority to make the sale is recognized, either before or after the sale, in a writing that states either the dollar amount or rate of commission. Compare N.J.S.A. 25:1-16(b) with N.J.S.A. 25:1-9 (repealed). One of the primary substantive changes was to replace all references to the "owner" with the word "principal," thereby recognizing that a broker's right to a commission may derive from an agreement with the buyer, the seller, or the owner, of the property.
Another change pertains to the broker's entitlement to commission where the agreement was oral and no principal provided written authorization for the broker to act. Under both the old and new statutes, the broker can recover a commission if within five days after the oral agreement, the broker sends the owner a notice stating the terms of the agreement including the commission amount or rate, and if the owner does not repudiate or terminate the agreement prior to the actual sale of the property. N.J.S.A. 25:1-9 (repealed); N.J.S.A. 25:1-16(d). Both statutes also protect the broker's right to a commission so long as, prior to the time that the principal serves the broker with a written rejection, the broker "in good faith," has begun "negotiations" with a prospective purchaser and such negotiations are pending at the time of the repudiation. N.J.S.A. 25:1-9 (repealed); N.J.S.A. 25:1-16(d)(2). The difference arises because the new statute describes the predicate situation for entitlement to a commission as "negotiations with a prospective party *1104 who later effects the transfer or sale," thereby covering a broader range of circumstances than negotiations with the ultimate buyer.
In this case both parties argue that their desired result is the same under either statute because the relevant substantive provisions remain unchanged. The issue remains whether the parties' communications satisfy the basic requirements of a writing or writings sufficient to satisfy the statute.
The trial judge concluded that the statute of frauds was satisfied, first, by the "series of correspondence" between the Bank or its agents and Long and, second, by the terms of Schlesinger's August 21, 1995, letter that "recognized" Long with respect to Herzberg, which led the judge to further conclude that the arrangement constituted an "open listing" in accordance with R.A. Intile Realty Co. v. Raho, 259 N.J.Super. 438, 614 A.2d 167 (Law Div. 1992). We first consider whether the conclusions and findings are supported by competent, relevant and reasonably credible evidence so as to be binding upon us. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974).
Strict compliance with the statute of frauds is essential for a broker to recover a commission for the sale of real estate. Tannenbaum & Milask, Inc. v. Mazzola, 309 N.J.Super. 88, 95, 706 A.2d 780 (App. Div.1998); R.A. Intile Realty, Inc. v. Raho, supra, 259 N.J.Super. at 454, 614 A.2d 167. The statute's provision that a broker may be entitled to a commission based on written authorization to act is set forth in N.J.S.A. 25:1-16(b) and the first paragraph of N.J.S.A. 25:1-9 (repealed). It is undisputed that no writing was signed by the Bank which recognized plaintiff's authority to sell the property, or indicated any rate of commission. Schlesinger's letter of August 21, 1995, stated that the Bank would "recognize" plaintiff "with respect to Mr. Leeds and Mr. Herzberg" but no mention was made of a commission or the rate. The letter does acknowledge, however, that it was sent in response to plaintiff's August 17, 1995, letter which did refer to a ten percent commission.
The trial judge relied on Intile, which holds that the statute may be satisfied by a series of correspondence, rather than a single document. A factual distinction is that the issue in Intile, was the effect of two letters written by a broker as confirmation of an oral agreement rather than sub judice in which the judge determined that a series of letters between both parties constituted effective written authorization by the seller. See R.A. Intile Realty, Inc. v. Raho, supra, 259 N.J.Super. at 464-67, 614 A.2d 167. Nonetheless, assuming that the reasoning in Intile is applicable here, if plaintiff's letter had clearly and unequivocally set forth a desired commission amount or rate, then Schlesinger's response might have constituted a written authorization sufficient to satisfy the statute. Plaintiff's letter, however, was unclear and contradictory regarding the amount of commission involved and the basis for the payment. It characterized a commission of $300,000 on a gross sale of $3.5 million, as "a 10% sales commission," and referred to this commission figure only in the specific context of a gross sale of $3.5 million and net sale of $3.2 million, which would "preserve [the Bank's] desired net of $3 million dollars."
Despite the trial judge's finding that the authorization was based on the "series of correspondence," he did not discuss the ten percent commission figure in plaintiff's letter, finding only that the Bank had agreed to pay a "reasonable" commission. However, Schlesinger's letter does not state that the Bank will pay a "reasonable" commission; it makes no reference to any *1105 commission amount whatsoever. There is also no legal support, however, for the notion that the statute is satisfied by the implied agreement to pay an unspecified "reasonable" commission. Such a conclusion is antithetical to the specific language and purpose of the statute. The statute requires that the writing state "either the amount or the rate of commission," N.J.S.A. 25:1-16(c). To hold that the specific statutory direction is satisfied by an implied agreement to pay a "reasonable" commission renders that portion of the statute meaningless and would be a violation of basic statutory construction. New Jersey Carpenters Apprentice Trng. & Educ. Fund v. Bor. of Kenilworth, 147 N.J. 171, 179-80, 685 A.2d 1309 (1996) (quoting State v. Reynolds, 124 N.J. 559, 564, 592 A.2d 194 (1991)), cert. denied, 520 U.S. 1241, 117 S.Ct. 1845, 137 L.Ed.2d 1048 (1997).
Furthermore, the trial court's analysis and conclusion is inconsistent with the express legislative intent to minimize instances of fraud and misinterpretation and confusion with respect to entitlement of real estate commissions by requiring strict statutory compliance. Ellsworth Dobbs, Inc., supra, 50 N.J. at 552-53, 236 A.2d 843. An implied agreement to pay a "reasonable" commission is fraught with risk of misunderstanding, misinterpretation and possible litigation, the avoidance of which is the statute's purpose. We therefore conclude that there is no factual or legal basis in support of the trial judge's conclusion that Schlesinger's August 21, 1995, letter satisfied the written authorization requirement of the statute of frauds entitling plaintiff to a "reasonable" commission.
Plaintiff argues alternatively that there was compliance with the statutory provision upholding a broker's commission when the broker provides written confirmation of an earlier oral agreement. He claims the requirement was satisfied by his June 2, 1995 letter to Sandlund "and/or the certified mail letter of July 14, 1995, to Tockarshewsky." We disagree.
The handwritten fax of June 2, 1995, directed to Sandlund is primarily a request for an information package and makes no reference to a commission amount. Long testified that at the time he wrote the note, he did not know whether he intended to act as buyer or broker, and what the commission might be. Moreover, the letter was faxed, rather than served personally or by registered or certified mail as required by the statute. N.J.S.A. 25:1-16(e); N.J.S.A. 25:1-9 (repealed).
As to Long's July 14, 1995, letter to Tockarshewsky, the record does not support the conclusion that the letter was preceded by any oral agreement between the two men. Plaintiff never identified any dates on which any conversations occurred, and the record does not indicate that plaintiff was asked directly if he had any conversations with Tockarshewsky. Moreover, Long testified that he wrote the letter "to get [Tockarshewsky's] attention" and tell him "I'm out there working for you" because "[h]ow else could I tell him? You see, I wasn't going to be able to tell him verbally so I put it in writing." We find there is no basis in the record to substantiate the assertion that Long's letter of July 14, 1995, was in confirmation of any prior oral agreement that was made in the previous five days as required by N.J.S.A. 25:1-16(d).
Moreover, the only commission amount noted by plaintiff in that letter was a $300,000 commission on a sale of $3.5 million. In his testimony, plaintiff claimed that this reference notified the Bank that he "was going to go for the 10 percent commission." However, the math is obviously faulty, and the ten-percent figure was never mentioned. At best, the letter specifies what the commission would be if *1106 the property was sold for $3.5 million. It provides no basis to extrapolate what commission plaintiff would be owed if the property sold for any other price, or to conclude that plaintiff would be owed any commission at all if he did not meet the precise terms of his own letter. Therefore, the evidence does not support a conclusion that plaintiff's letters to the Bank constituted the confirmation of a prior oral agreement that is contemplated by the statute.
Plaintiff's argument that he and the Bank had a valid commission agreement with respect to the Herzberg/Burkett purchase is belied by his conduct when he discovered that the property might be sold at a price that would generate either no commission or a commission lower than he wanted. He testified that when he was informed of the $1.7 million offer he set out to obtain another purchaser to obtain a commission and yet contends that this was the sales agreement which is the basis for his ten percent commission.
Not only does the record not support plaintiff's argument of entitlement to a ten percent commission, it also does not support the trial judge's decision to award plaintiff a five-percent commission. The finding that Long was entitled to a five, rather than a ten percent commission, contradicts the judge's conclusion that a written agreement existed in accordance with the statute. The only writings that referred to an amount or rate of commission were from Long alone and referred to the rate as ten percent or $300,000 based on a sale of $3.5 million. Given its finding that these writings were sufficient, the court had no basis for reducing the commission to five percent or $135,000, rather than the ten percent and $300,000 specified in Long's letters.
In addition, assuming that the court properly found that the agreement was valid only so far as it promised to pay a "reasonable" commission, the record provides no support for the court's finding that five percent was a reasonable commission. Both Burkett and Sandlund testified that Long performed none of the tasks for which they had hired brokers in the past. The record clearly establishes that, subsequent to introducing the property to Burkett, Long performed no work at all at Sandlund's direction, and virtually all of his work for Burkett was in connection with his efforts to become the after-market broker for the finished condominium units. Long presented no expert evidence regarding the appropriate commission due him for his work, no records of his own previous agreements, and no documentation of his work on the transaction. Defendants presented no expert evidence on the rate of commission, but both Sandlund and Burkett testified regarding their previous agreements with brokers, the rates of commissions, and the services for which they contracted in exchange for those commissions. Long had provided defendants with no comparable services. The record provides no support for the court's decision that plaintiff's work entitled him to a commission of five percent of the sale price.
We conclude therefore that the trial court's decision that the parties' writings created an enforceable agreement under the statute of frauds is unsupported by the record and the law, and its decision that plaintiff was entitled to a five percent commission must be reversed.
On the cross-appeal, plaintiff argues initially that he was entitled to a ten percent commission based on the trial court's findings that the writings had met the statute of frauds, and that the court erred in awarding only a five percent commission. As we have discussed, there is no factual or legal foundation for the argument. He next contends that defendants conspired in bad faith to tortiously interfere *1107 with his commission and seeks a ten percent full commission, an equitable lien, and punitive damages. He also argues that he was entitled to judgment against the individual defendants Herzberg, Shull and Burkett, for conspiratorial conduct.
The elements of a cause of action for tortious interference with economic advantage are (1) a protected interest, which need not amount to an enforceable contract; (2) intentional interference with that protected interest without justification; (3) the reasonable likelihood that the anticipated benefit from the protected interest would have been realized but for the interference; and (4) economic damage as a result. Jenkins v. Region Nine Housing Corp., 306 N.J.Super. 258, 265, 703 A.2d 664 (App.Div.1997), certif. denied, 153 N.J. 405, 709 A.2d 798 (1998).
Plaintiff's arguments of bad faith and tortious interference relate to the moneys paid to the Herzbergs which he claims was a "pay-off" to use what would have been plaintiff's commission money to reduce the sale price below $3,000,000. However, the trial court made no such finding, and the record does not support the allegations of bad faith or tortious interference.
The testimony and its reasonable inferences lead instead to the conclusion that the Herzbergs were never viable purchasers of the property, and were considered by the other defendants as part of the purchasing group only because they misrepresented their financial resources and business experience. The record also supports defendants' contentions that the payment was made to avoid the Herzbergs' threats of further trouble and interference in the project, to compensate them for their time, and, most importantly, to avoid a breach in relations between Hawkins, the leader of the group, and his close, influential friend, Bacot. Plaintiff's argument that the Herzbergs were removed to avoid the brokers' fee is contrary to the uncontradicted evidence that the Herzbergs brought nothing to the table in terms of the finances or experience necessary to accomplish this complex real estate transaction, and therefore, never were appropriate candidates to purchase the property.
Plaintiff's further allegation that defendants manipulated the purchase price to avoid a commission is also unsupported by the evidence. It was undisputed that, at the time Sandlund set the purchase price at $3 million, he was unaware that the property had been stubbed, and that much of the apparently completed infrastructure remained unbuilt. The discovery of the actual condition of the property required all the parties to reassess its value and to account for the work necessary to complete the infrastructure. This was accomplished in the mobilization agreement, under which the Bank nominally paid for the work with the knowledge that the money would be recouped from Burkett's group, as long as it was the ultimate purchaser of the property. There is nothing to indicate that the price set in the mobilization agreement was based on anything other than the cost warranted by the condition of the property.
In short, the record does not substantiate plaintiff's allegations that defendants acted in bad faith throughout the period of the deal with the intent to cheat plaintiff out of his commission. The remaining arguments raised by plaintiff in his cross-appeal are without sufficient merit to warrant further discussion in this written opinion. R. 2:11-3(e)(1)(E).
Reversed and remanded for judgment to be entered in favor of defendants.
STERN, P.J.A.D., concurring.
I would adhere to our opinion in Sutton v. Lienau, 225 N.J.Super. 293, 542 A.2d 473 (App.Div.1988), certif. denied, 111 N.J. 650, 546 A.2d 559 (1988), at least if this case is controlled by the Statute of Frauds *1108 in effect at the time of the writings (an issue my colleagues do not resolve),[5] and conclude that, because "an authorized agent can by his signature satisfy the requirement of a writing," id. at 300, 542 A.2d 473, the August 21, 1995 letter of attorney Schlesinger written on behalf of defendant Riverdale Timber Ridge, Inc., completed an integrated set of documents. Those documents, "taken together," can be read to "contain the whole bargain," ibid., which would require the payment of a commission but for the fact that the closing price would not net the sellers the required $3,000,000 (much less $3,200,000) after payment of the commission.[6] There was no repudiation by Schlesinger of the commission noted in plaintiff's letter to which Schlesinger responded.
Consistent with plaintiff's prior communications with Sten Sandlund, the sellers' real estate manager, and plaintiff's letter of July 14, 1995 to Joseph Tockarshewsky, the bank's president and chief executive officer, plaintiff wrote to attorney Schlesinger on August 17, 1995 that:
At Mr. Sandlund's direction I have quoted a $3.5 million dollar price so as to preserve PSB's desired net of $3 million dollars, and if PSB gets $3.5 million from my buyers, and I take $300k for a 10% sales commission they would net $3.2 million and the deal would more than satisfy PSB's requirements.
... I have agreements with these buyers that they will make these offers through my office and that in any interim discussions, they were to make PSB aware that my office was the procuring office in bringing the deal to them, and that my office was seeking a 10% commission on the deal.
....
I think Timber Ridge has great promise as a project in the hands of the right developer and my interest is to get PSB the highest and best deal so I offered it at $3.5m....
I have always been up front and followed through on discussions with the bank representatives. In return I ask for this listing authorization and recognition and protection of my 10% commission as the procuring broker for any offers coming in from these prospective buyers as noted now and in my July 14th letter.
In response to the August 17, 1995 letter, Schlesinger wrote to plaintiff on August 21, 1995 stating, in part:
You are to cease showing the property to any other individuals without having a listing agreement. With respect to the individual to whom you have shown the property, my clients will recognize you with respect to ... Mr. Herzberg.
Thus, whether read as a failure on the part of the sellers to repudiate or terminate the agreement, or as an integrated set of writings authorizing plaintiff to act as defendant's broker with respect to Herzberg, I will assume the broker would be entitled to a commission upon a closing of the sale or transfer of the property in the amount noted in plaintiff's August 17, 1995 letter which included a rate or amount of commission.
While it may be true that Herzberg was not a part of the ultimate purchase for *1109 sound business reasons, I will also assume that does not justify reversal because there is evidence in the record to support the trial judge's conclusion that the purchasers were introduced to the property by Herzberg and that Herzberg was a participant in the transaction resulting in the purchase by Rock Creek Crossing.
However, the sale price was neither $3,000,000 (much less $3,500,000), nor netted the sellers $3,000,000 (much less $3,200,000) which plaintiff acknowledged in his writings was necessary for him to earn his commission. In these circumstances, plaintiff, in the absence of a traditional brokerage agreement or exclusive listing agreement, took the "calculated risk," McCann v. Biss, 65 N.J. 301, 308, 322 A.2d 161 (1974), that the person he introduced to the property would buy it in an amount less than that which would give rise to a commission under the integrated writings; and as my colleagues detail, the evidence does not justify a conclusion that "defendants manipulated the purchase price" to avoid a commission, or that the purchase price was anything but an arm's length negotiated amount based on the condition of the property. Hence, I agree with the court that there is no basis for a recovery on the grounds of tortious interference or breach of some other duty to act in good faith. See, e.g., Harris v. Perl, 41 N.J. 455, 462-65, 197 A.2d 359 (1964).
In these circumstances, I can understand how the trial judge nevertheless desired to protect the broker because of Schlesinger's letter that plaintiff would be "recognize[d] ... with respect to ... Mr. Herzberg." The trial judge awarded a five percent commission because he thought it was "reasonable." The decision was the equivalent of awarding a commission based on the concept of quantum meruit, implied contract, or "fundamental fairness." However, these principles do not apply in this setting because the Statute of Frauds was adopted by the Legislature to establish the means by which real estate brokers are entitled to earn a commission. See McCann v. Biss, supra, 65 N.J. at 303, 308-11, 322 A.2d 161. See also Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435-41, 608 A.2d 280 (1992), where the agreement's lack of enforcement was not based on the Statute of Frauds. Weichert dealt with a suit against buyers at a time the former Statute of Frauds did not protect buyers, so a quantum meruit recovery was warranted. Ibid. Even if the former statute applies in this case, there is no contractual relationship with the buyer, and hence no basis for a quantum meruit recovery.
While I have some sympathy for a broker in a case in which the broker introduces the purchaser to the property but does not satisfy the Statute of Frauds, the argument is with the statute, and the remedy must come from the Legislature.
NOTES
[1] RWB Associates was a limited partnership for land development and single family home construction whose shareholders were Burkett, Shull, Hawkins, Tom Peacock, and Arwood (3T21). Burkett, Inc., was the general partner and had the same shareholders as RWB.
[2] The court misspoke and refered to Shull as the manager, although he clearly was referring to Burkett.
[3] In May 1995, when plaintiff first contacted Sandlund, the statute in effect was N.J.S.A. 25:1-9, which provided,

"Except as herein otherwise provided, no broker or real estate agent selling or exchanging real estate for or on account of the owner shall be entitled to any commission for such sale or exchange, unless his authority therefor is in writing, signed by the owner or his authorized agent, or unless such authority is recognized in a writing or memorandum, signed by the owner or his authorized agent, either before or after such sale or exchange has been effected, and, in either case, the rate of commission on the dollar or the amount of the commission shall have been stated therein.
Any broker or real estate agent selling or exchanging real estate pursuant to an oral agreement with the owner of such real estate, who shall actually effect such sale or exchange before such oral agreement shall have been repudiated or terminated by the owner in writing as hereinafter provided, may recover from such owner the amount of commission on such sale or exchange, if the broker or agent shall, within five days after the making of the oral agreement and prior to the actual sale or exchange of such real estate, serve upon the owner a notice in writing, setting forth the terms of the oral agreement and stating the rate or amount of commission to be paid thereunder, and if the owner shall not have repudiated or terminated the oral agreement prior to the actual sale or exchange of the real estate.
The owner may, at any time after receiving from the broker or agent the notice mentioned in the second paragraph of this section, repudiate or terminate the oral agreement by serving upon the broker or agent, prior to the actual sale or exchange of the real estate by the broker or agent, a notice in writing to that effect, in which case the oral agreement shall be null and void, and no recovery of any commission shall be had under the oral agreement, unless the broker or agent in good faith shall have entered into negotiations with a prospective customer, and such negotiations shall be pending at the time of the repudiation or termination of the oral agreement, and the sale or exchange is subsequently consummated between the owner and such customer, in which case the broker or agent may recover his commission on such sale or exchange, notwithstanding the repudiation or termination of the oral agreement.
The notice provided for in this section shall be served either personally or by forwarding the same to the person to be served, by registered mail, to his last known post-office address."
[4] L. 1995, c. 360, § 7, and now reads in pertinent part as follows:

"b. Except as provided in subsection d. of this section, a real estate broker who acts as agent or broker on behalf of a principal for the transfer of an interest in real estate, including lease interests for less than three years, is entitled to a commission only if before or after the transfer the authority of the broker is given or recognized in a writing signed by the principal or the principal's authorized agent, and the writing states either the amount or the rate of commission.
For the purposes of this subsection, the interest of a mortgagee or lienor is not an interest in real estate.
....
d. A broker who acts pursuant to an oral agreement is entitled to a commission only if:
(1) within five days after making the oral agreement and before the transfer or sale, the broker serves the principal with a written notice which states that its terms are those of the prior oral agreement including the rate or amount of commission to be paid; and
(2) before the principal serves the broker with a written rejection of the oral agreement, the broker either effects the transfer or sale, or, in good faith, enters negotiations with a prospective party who later effects the transfer or sale.
e. The notices provided for in this section shall be served either personally, or by registered or certified mail, at the last known address of the person to be served.
[N.J.S.A. 25:1-16.]
[5] In light of my conclusion, I need not address the impact of the revised Statute of Frauds, adopted effective January 5, 1996, which was in effect at the time of closing. See N.J.S.A. 25:1-9 (repealed); N.J.S.A. 25:1-16(b),(d).
[6] Even if there is no integrated set of writings which generates a rate or amount of commission, or if the amount is not sufficiently established in an enforceable agreement, the result would be the same due to the parties' failure to agree on the amount of commission. See Weichert Co. Realtors v. Ryan, 128 N.J. 427, 439-40, 608 A.2d 280 (1992).