**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5469-14T3

MARKEIM-CHALMERS, INC.,

    Plaintiff-Respondent/
    Cross-Appellant,

v.

WILLINGBORO URBAN RENEWAL, LLC;
D&D COLLEGE PROPERTIES, LLC;
CAMPUS PROPERTIES, LLC,
HANKINS PROPERTIES, LLC; STEVEN
HANKINS; STRAYER UNIVERSITY, INC.;
and RENEWAL WILLINGBORO, LLC,

    Defendants-Appellants/
    Cross-Respondents.

_____

    Argued April 24, 2017 — Decided August 3, 2017

    Before Judges Sabatino, Currier and Geiger.

    On appeal from Superior Court of New Jersey,
    Law Division, Camden County, Docket No. L-
    3111-12.

    Peter N. Milligan argued the cause for
    appellants/cross-respondents.

    Bruce S. Luckman argued the cause for
    respondent/cross-appellant (Sherman,
    Silverstein, Kohl, Rose & Podolsky, P.A.,
    attorneys; Mr. Luckman, of counsel and on the
    briefs).

PER CURIAM

At issue in this matter is the entitlement to a real estate broker's commission for the lease and sublease of a commercial building in the Township of Willingboro. On cross-motions for summary judgment, the judge granted plaintiff Markeim-Chalmers, Inc. ("MCI") partial summary judgment, awarding MCI a $100,000 commission arising from the ninety-nine-year lease of the property. The judge also granted defendants, Renewal Willingboro LLC, Inc. ("Renewal Willingboro"), Willingboro Urban Renewal, LLC ("Urban Renewal"), D&D College Properties, LLC ("D&D"), Campus Properties, LLC ("Campus Properties"), Hankins Properties, LLC ("Hankins Properties"), Steven Hankins ("Hankins"), and Strayer University, Inc. ("Strayer") partial summary judgment dismissing MCI's claim for a commission on the ten-year sublease of the property to Strayer. For the reasons that follow, we affirm in part and reverse and remand in part.

I.

We glean the following facts from the motion record. Defendant Renewal Willingboro and its wholly owned subsidiary Urban Renewal developed the Willingboro Town Center in Willingboro Township. One of their main tenants was Burlington County College, which rented the 20,992 square foot commercial property located at 300 Campbell Street (the "property") owned by Urban Renewal.

In 2011, the college announced its intention not to renew its lease, which would leave the office building vacant after September 2012. Urban Renewal's lender required it to find a new tenant for the building. As a result, Urban Renewal hired several real estate brokers, including MCI, to secure a new tenant or buyer for the property. Over the course of the next two years, Urban Renewal and MCI entered into several short-term agreements where MCI would list the property in the hopes of finding either a purchaser or tenant and, if it did, receive a broker's commission.[1]

In one broker agreement, the "open listing agreement," Renewal Willingboro agreed to pay MCI a five percent commission if a "sale or exchange" of the property occurred before a specified date between Urban Renewal[2] and a prospective buyer that had been "registered" by MCI with Urban Renewal. The agreement required

---

[1] On September 15, 2010, MCI and Urban Renewal entered into an "Exclusive Right to Lease Listing Agreement," which by its terms expired on October 15, 2010. The agreement was extended by the parties and subsequently terminated by mutual consent before a tenant was found. On July 25, 2011, MCI and Urban Renewal signed an exclusive "right to sell" agreement, which would expire on October 15, 2011. The agreement expired without a buyer being found or any prospective purchasers being registered by MCI.

[2] Throughout the documentation in this case, Renewal Willingboro and Urban Renewal are frequently referred to interchangeably. Robert B. Stang and Charles Hack were the managing members of both entities. As one entity wholly owns the other and both are controlled by the same people, the distinction does not substantively affect our analysis.

MCI to inform Urban Renewal of prospective buyers in order to receive a five-percent commission "in the event of a sale of property." The agreement also stated: "if owner accepts an offer to <u>sell or exchange</u> within 6 months to anyone to whom [MCI] has registered in writing with Owner said commission shall be due and payable as contained herein." (Emphasis added). The agreement was not exclusive, and Urban Renewal could have authorized other brokers to market the property.

MCI and Urban Renewal also separately entered into a "lease commission agreement," in which Urban Renewal agreed to pay MCI a five-percent commission if the property was leased to a "registered" third party by a specified date. The "registered" parties identified by MCI under the open listing agreement included Steven Hankins and two related companies that he owned, Hankins Properties and Campus Properties.

On December 4, 2011, MCI entered into a "Confidentiality & Client Registration Agreement" with Strayer as a potential buyer and provided it with confidential information about the property. In emails later that week to Strayer's broker, Cushman and

Wakefield of Pennsylvania, Inc. ("C&W"), MCI shared information about the property's current tenant and potential sales prices.[3]

On February 2, 2012, MCI sent Stang and Urban Renewal a letter of intent ("LOI") from Hankins and Campus Properties detailing a proposal to buy the college building for $2 million. The LOI noted that MCI (representing Urban Renewal) and C&W (representing Hankins) were the brokers on the deal. The LOI expired on February 7, 2012.

Over the next few days, MCI facilitated discussions between Urban Renewal and the Campus Properties entities, and secured permission from Hankins to keep the LOI open "a couple of days" past the February 7, 2012 deadline. That back-and-forth continued for a few weeks.

On February 23, 2012, MCI — responding to an email not in the appellate record — emailed Stang and Urban Renewal, writing:

> Glad to see that things seem to be progressing. Please try to copy me on all correspondence with Steve Hankins on this matter as we discussed so I can stay in the loop. I know you prefer to negotiate with Steve directly, but I am here to assist however you would like.

---

[3] During oral argument before the trial court, MCI's counsel admitted there was no listing agreement at that point in the chronology between MCI and Urban Renewal. He also admitted that MCI did not register Strayer under the lease commission agreement.

For reasons not clear in the appellate record, Stang rejected Campus Properties' offer to purchase the property for $2 million. Hankins then became involved in Strayer's interest in the property on behalf of Urban Renewal. He certified later, "After a failed attempt to purchase the real estate, I began to form a professional and business relationship with the owner." Although Urban Renewal admits that MCI introduced Hankins to it, it also independently inquired "about hiring Hankins who would earn a developer's fee for such work." Urban Renewal further admits to hiring Campus Properties as a developer for the property.

Hankins wrote that he previously had a long-term relationship with Strayer — who already was leasing office space in the property from Burlington County College — and Hankins "abandoned my efforts to purchase the premises, and started assisting in putting an agreement together wherein Strayer University, Inc. would lease the premises in question."

As MCI's listing agreement with Strayer was expiring, C&W also signed a broker agreement with Urban Renewal to market the property. On May 10, 2012, Stang sent C&W a commission agreement for the property, and C&W registered Strayer with Urban Renewal as a potential tenant. The agreement notes that no other broker was involved with this property aside from MCI. The agreement established a sliding scale commission for C&W of six percent of

the lease price in year one to three percent of the lease price in year three. The agreement estimated that Strayer would pay $2.9 million in rent over ten years, with C&W receiving a commission of approximately $137,000.

Strayer expressed interest in renting the property. According to defendants, after the lease commission agreement with MCI expired, Strayer indicated it would only sign a lease with Urban Renewal if Hankins had an ownership interest in the property. Instead of a direct sale or lease, Urban Renewal entered into a different transaction in order to facilitate the lease of the property to Strayer and to manage Strayer's rental.

What occurred is that in June 2012, Urban Renewal and Campus Properties formed a new entity, D&D, a limited liability company, with two members — Renewal Willingboro and Campus Properties, with Renewal Willingboro owning ninety percent and Campus Properties owning the remaining ten percent. The D&D operating agreement noted that Campus Properties would make $96,173 in capital contributions to D&D. Renewal Willingboro contributed $867,557, which represented the "estimated cost of the Strayer Build Out." Additionally, Renewal Willingboro contributed $2 million in capital, "which the parties agree is the value of the ground lease of the property being contributed[.]"

D&D was formed to allow Renewal Willingboro to lease the property to D&D, and for "[Steven] Hankins to oversee construction of leasehold improvements under the Strayer Lease and the construction of additional leasehold improvements for the 5,091 rentable square feet in the property."

On June 6, 2012, Urban Renewal entered into a ninety-nine-year lease of the property with D&D for the nominal rent of $1.00 per year in consideration. Stang, as managing member for both entities, signed both the landlord and tenant portions of the lease. In turn, on June 12, 2012, D&D entered into a ten-year sublease of the property with Strayer, commencing October 1, 2012. The sublease specified a sliding scale for rent payments, with Strayer paying $13,249.17 a month initially and up to $35,216.58 a month in year ten.

The sublease recognized Urban Renewal as the property owner and Renewal Willingboro as redevelopment manager. Although Strayer previously discussed leasing the entire building, it only leased 15,899 square feet in the building. The ten-year sublease with Strayer was entered into after both the open listing and lease commission agreements had expired. MCI never received a commission for the sublease. C&W received a $137,000 commission as broker for the Strayer sublease.

C&W, which is not a party to this litigation, served as the broker for the ten-year sublease from D&D to Strayer, and performed the services work as broker on that transaction. The estimated value of the rental payments under the ten-year sublease to Strayer was $2.9 million.

Following the lease, Flushing Bank agreed to modify Urban Renewal's mortgage on the property on August 31, 2012. D&D agreed to assume the mortgage, which then had a balance of nearly $3.9 million. Stang and Hack personally guaranteed it.

Plaintiff filed its complaint in July 2012. The complaint, as later amended, asserted breach of contract against Urban Renewal (count one); unjust enrichment against all defendants (count two); quantum meruit against all defendants (count three); tortious interference with contract against all defendants (count four); breach of the implied covenant of good faith and fair dealing against all defendants (count five); civil conspiracy against all defendants (count six); and aiding and abetting against D&D, Campus Properties, Hankins Properties, Strayer, and Renewal Willingboro (count seven).

Defendants did not assert the affirmative defense of statute of frauds in their answer. See R. 4:5-4 (prescribing that affirmative defenses such as the statute of frauds are to be set forth specifically and separately).

In October 2013, while the litigation was pending, Campus Properties transferred its membership interest in D&D to Renewal Willingboro for $40,000, leaving Renewal Willingboro as the sole remaining member and owner of D&D.

The parties filed cross-motions for summary judgment. MCI argued that it was entitled to a commission under the open listing agreement for the "transfer/exchange" of the property pursuant to the ninety-nine-year lease of the property to D&D. Relying principally on Renaissance Plaza Assocs. v. Atlantic City, 18 N.J. Tax 342 (Tax 1998), and an unpublished appellate opinion, MCI contended that the formation of a joint venture and the signing of a ninety-nine-year lease triggered the right to a commission. MCI further argued that, by previously registering Strayer with Urban Renewal, defendants owed it a commission for the subsequent ten-year lease signed by Strayer. MCI alternatively argued it was entitled to damages in quantum meruit under Weichert Co. Realtors v. Ryan, 128 N.J. 427 (1992), despite defendant's claim that it failed to comply with the statute of frauds.

Defendants argued that MCI only had a contractual right to a commission for the sale of the property, which did not occur, and therefore was not entitled to a commission for the sublease to Strayer. Defendants further argued that the relationship between D&D and Urban Renewal was not a joint venture, and even if it

were, MCI had no agreement for a commission on a joint venture, unlike the broker in R.J. Brunelli & Co., supra. Defendants also argued that MCI's reliance on Weichert Co. Realtors, supra, was misplaced because the statute of frauds was amended by the Legislature after that Supreme Court case was decided.

After considering the matter without any evidentiary hearing, the trial court granted MCI partial summary judgment, finding that MCI was entitled to a commission under the open listing agreement for the ninety-nine-year lease to D&D but not for the lease to Strayer under the lease commission agreement. The trial court ordered all of the defendants jointly and severally liable to MCI for the sum of $100,000 in damages.

The trial court first found that MCI was not entitled to a commission under the lease commission agreement for the ten-year sublease to Strayer, stating:

> With respect to this matter, I do not believe there is any entitlement to any commission on the lease. There -- it was an argument made that it should bootstrap back to an agreement that was before July 25, 2011, the listing agreement, because that spoke about leases. I cannot find anything that says that there is any entitlement for [MCI], in any respect, with -- no matter how broadly I read any of the documents within the law, that it would entitle them to any type of commission on a lease. Whatever was paid to Cushman & Wakefield was paid to Cushman & Wakefield. It is of no consequence. I do not see MCI as having a right to a commission on the lease.

The court therefore granted partial summary judgment to defendants, dismissing MCI's claim for damages for the ten-year sublease to Strayer.

The court reached a different result with respect to MCI's claim for a commission on the ninety-nine-year lease to D&D. After analyzing the open listing agreement, MCI's registration of Strayer and the Hankins entities, and the January 4 letter from MCI to Urban Renewal registering Hankins, Hankins Properties and Campus Properties under the open listing agreement, the court concluded that defendants had improperly tried to circumvent paying a commission to MCI. The court ruled that the ninety-nine-year lease from Urban Renewal to D&D was effectively a sale or exchange of the property for value, which triggered the right to a commission under the open listing agreement. The court further elaborated:

> It's obvious to the Court that the entities--
> the defendant entities had an obligation to
> [MCI] to pay commission on a sale or exchange,
> and that they proceeded to undertake a
> transaction that would otherwise potentially
> not be considered to trigger a commission to
> be due, and they did not accomplish that in
> the eyes of this Court. The transaction, as
> evidenced by the operating agreement, was a
> method that they attempted to utilize to avoid
> the document looking like a sale or
> hypothecation of rights, or what have you, but
> that's, in fact, what it did. They gave up
> their right to utilize the property, and it

> was fairly blatant to the [c]ourt what they
> were attempting to do. They were attempting
> to cut out [MCI] from this agreement. For
> whatever reason, it doesn't matter.

With regard to the amount of the commission to be awarded, the court stated: "I derived the value from the operating agreement, from the capitalization in the operating agreement." The court calculated the commission to be five percent of the $2 million estimated value of the leased property, as listed in the operating agreement, or $100,000.

Based on those findings, the court granted partial summary judgment to MCI against all defendants for $100,000, with liability imposed against them jointly, severally, and in the alternative.

Defendants now appeal the trial court's order requiring them to pay a real estate commission to MCI for the ninety-nine-year lease. On appeal, defendants raise the following arguments: (1) there was no exchange of the property entitling MCI to a commission; (2) there was no hypothecation of rights to the property entitling MCI to a commission; (3) MCI had no right to a commission for a lease of the property; and (4) defendants Strayer, Campus Properties, Hankins Properties, and Hankins in particular cannot be liable for any commission under the open listing agreement between MCI and Urban Renewal.

MCI cross-appealed the trial court's order denying its claim for compensation for its efforts in connection with the ten-year sublease of the property to Strayer. On appeal, MCI raises the following arguments: (1) MCI is entitled to additional compensation in the amount of $137,000 in connection with the Strayer lease transaction; (2) MCI is entitled to recover commissions, notwithstanding the statute of frauds; and (3) there is no express contract which bars MCI's quantum meruit claims.

II.

We review the trial court's rulings under well-known standards. Our review of a ruling on summary judgment is de novo. "[W]e apply the same standard governing the trial court—we view the evidence in the light most favorable to the non-moving party." Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012). "If a review of the record reveals that 'there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law,' then a court should grant summary judgment." Nicholas v. Mynster, 213 N.J. 463, 478 (2013) (quoting R. 4:46-2(c)). We thus consider "whether the competent evidential materials presented, when viewed in a light most favorable to the non-moving party, are sufficient to permit a factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am.,

142 <u>N.J.</u> 520, 540 (1995). "In applying that standard, a court properly grants summary judgement when the evidence is so one-sided that one party must prevail as a matter of law." <u>Davis v. Brickman Landscaping, Ltd.</u>, 219 <u>N.J.</u> 395, 406 (2014) (citation omitted). Because the trial court granted partial summary judgment to each party, we must consider the facts in a light most favorable to the respective non-moving party or parties.

Further, in construing the meaning of a statute or the common law, "our review is de novo." <u>Nicholas</u>, <u>supra</u>, 213 <u>N.J.</u> at 478. "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." <u>Manalapan Realty, L.P. v. Twp. Comm.</u>, 140 <u>N.J.</u> 366, 378 (1995). Moreover, because the construction of contract terms is likewise a question of law, <u>see</u> <u>Boss v. Hackensack Univ. Med. Ctr.</u>, 345 <u>N.J. Super.</u> 78, 92 (App. Div. 2001), we independently review the trial court's construction on a de novo basis. <u>See</u> <u>Morgan v. Sanford Brown Inst.</u>, 225 <u>N.J.</u> 289, 302-03 (2016). For instance, whether a contract term is clear or ambiguous is a question of law. <u>Nester v. O'Donnell</u>, 301 <u>N.J. Super.</u> 198, 210 (App. Div. 1997). A term is ambiguous if it is "susceptible to at least two reasonable alternative interpretations." <u>Ibid.</u> (citation omitted). "If contract terms are unspecific or vague, extrinsic evidence may be used to shed

light on the mutual understanding of the parties." <u>Hall v. Bd. of Educ. of Jefferson</u>, 125 <u>N.J.</u> 299, 305 (1991); <u>see also</u> <u>Conway v. 287 Corp. Ctr. Assocs.</u>, 187 <u>N.J.</u> 259, 270 (2006) ("Extrinsic evidence may be used to uncover the true meaning of contractual terms.").

III.

We first address whether MCI is entitled to a commission under the open listing agreement for the ninety-nine-year lease to D&D. In order to qualify for a commission under the open listing agreement, the lease must constitute a "sale or exchange" of the property.

Ninety-nine-year leases are permitted in New Jersey. <u>See</u> <u>Brunswick v. Route 18 Shopping Ctr.</u>, 182 <u>N.J.</u> 210 (2005). Some states still limit leases to ninety-nine years. <u>See, e.g.</u>, <u>Nev. Rev. Stat.</u> § 111.200(2) (1963); <u>Code of Ala.</u> § 35-4-6 (1989). New Jersey has no such statutory limit, but it appears that the practice of parties entering into ninety-nine-year leases has persisted.

In <u>City of Atlantic City v. Cynwyd Investments</u>, 148 <u>N.J.</u> 55 (1997), the Court addressed the circumstances in which ninety-nine-year lessees may be treated as fee simple owners:

> In some circumstances, New Jersey courts have held that ninety-nine-year lessees are equivalent to fee simple owners under the common

16

law. <u>Lake End Corp. v. Twp. of Rockaway</u>, 185 <u>N.J. Super.</u> 248, 256 (App. Div. 1982) ("[a]s a matter of law and fact, ninety-nine-year leaseholds are the equivalent of a fee ownership for the purposes of real property taxation, valuation and assessment.") <u>See</u> <u>Ric-Cic Co. v. Bassinder</u>, 252 <u>N.J. Super.</u> 334 (App. Div. 1991) (granting standing to ninety-nine-year perpetual lessee to apply for variances under <u>N.J.S.A.</u> 40:55D-3 to -4). However, in <u>West Jersey Grove Camp Association v. City of Vineland</u>, 80 <u>N.J. Super.</u> 361 (App. Div. 1963), the court declined to afford property tax exemptions to holders of ninety-nine-year leases that were not renewable. Whether a ninety-nine-year lessee should be considered a <u>de facto</u> fee simple owner for condemnation purposes constitutes an issue of first impression. In general, the rights of the holder of a ninety-nine-year lease depend on the contract and the legislative intent underlying the applicable statutory regime. Although ninety-nine-year lessees are deemed to be equivalent to fee simple owners for certain purposes under the law, we decline to apply the doctrine to condemnation.

[<u>Id.</u> at 72.]

In <u>Cynwyd Investments</u>, the Court held that the 99-year lessee did not have pre-condemnation rights, but may participate in the eventual condemnation trial and present noncumulative evidence of fair value. <u>Id.</u> at 73.

As another illustration, in <u>Ocean Grove Camp Meeting v. Reeves</u>, 79 <u>N.J.L.</u> 334 (Sup. Ct.), <u>aff'd</u> 80 <u>N.J.L.</u> 464 (E. & A. 1910), property was leased for ninety-nine years, "renewable" by the lessee, "his heirs and assigns for a like term of years forever." <u>Id.</u> at 335. The court deemed the rent reserved to be

17

"grossly disproportionate to the value of the lands," and the lessee owned the buildings and improvements. Id. at 336. Under these circumstances, the court held that the lessee was liable for the assessed real estate taxes. In reaching that conclusion, the court engaged in the following analysis:

> It is quite plain that an instrument demising to one and his heirs and assigns a long term of years in land, renewable in perpetuity, conveys an ownership equivalent to a fee simple, although rent may be thereby reserved. It is very closely analogous to . . . a conveyance in fee simple, reserving to the grantor and his heirs a small ground rent. The entire beneficial ownership of the land resides as much in the lessee, in a case like the present, as in the grantee under such a deed reserving ground rent.
>
> [Id. at 338-39.]

"As a matter of law and fact, 99-year leaseholds are the equivalent of a fee ownership for the purposes of property taxation, valuation and assessment." Lake End Corp., supra, 185 N.J. Super. at 256. Consequently, individual leaseholds may be assessed for tax purposes as individual parcels of real property. Id. at 257. As a result, a tenant under a 99-year lease subject to renewal in perpetuity with an option to purchase after twenty years is treated as a property owner, since the lease is considered tantamount to a transfer in ownership for local property tax purposes. Renaissance Plaza Assocs., supra, 18 N.J. Tax at 347.

A tenancy for life, or for ninety-nine years or more, qualifies the tenant to receive a tax rebate under the Homestead Rebate Act, N.J.S.A. 54:4-3.80.  Macmillan v. Taxation Div. Dir., 180 N.J. Super. 175, 179 (App. Div. 1981).  However, leases are generally not taxable exchanges under the Internal Revenue Code. See 26 U.S.C.A. § 1031.  Moreover, a tenant's interest in a leasehold is mortgageable as a matter of general law.  29 New Jersey Practice, Law of Mortgages § 5.2, at 263 (Myron C. Weinstein) (2d ed. 2001).

Unlike these precedents that arose in the context of taxation, zoning, and condemnation matters, there is no legislative regime involved in this action, which concerns the enforcement of a contractual broker's commission between private parties.  Even so, related principles apply.

The lease between Urban Renewal and D&D expires after ninety-nine years.  Unlike in Ocean Grove, supra, 79 N.J.L. at 339, and Ric-Cic Co., supra, 252 N.J. Super. at 341-42, where the ninety-nine-year leases extended into perpetuity, no such open-ended language appears here.  The lease also does not contain a lessee renewal option, as in Lake End Corp., supra, 185 N.J. Super. at 255-56, or an option to purchase, as in Renaissance Plaza Assocs., supra, 18 N.J. Tax at 346-47.  Notwithstanding these factual aspects, our case law has at times equated a ninety-nine-year

lease with fee simple ownership rights, unless that designation would be against the public interest. See Cynwyd Investments, supra, 148 N.J. at 72-73 (condemnation proceedings). Equating this particular leasehold interest with a fee simple estate for purposes of considering a broker's right to a commission is not manifestly against the public interest.

Here, the facts militate strongly in favor of considering the lease an "exchange" under the open listing agreement. In addition to the extreme duration of the lease, the ground lease constituted the majority of Renewal Willingboro's capital contribution to the formation of D&D. D&D would have had no reason to exist, but for the lease. MCI introduced Urban Renewal to Hankins and Campus Properties. Campus Properties held a ten percent ownership interest in D&D. D&D was responsible for paying the real estate taxes on the property. D&D immediately subleased the property to Strayer.

Considering the totality of the circumstances, including the nature of the transactions and the relationship of the parties, the ninety-nine-year lease effectively should be treated in this particular context like a sale or an exchange. Accordingly, we hold that the ninety-nine-year lease between Urban Renewal and D&D constituted a "sale or exchange" within the meaning of the open listing agreement, thereby entitling MCI to a commission. To rule

otherwise would unjustly allow Renewal Willingboro to evade responsibility for a commission on the transaction, which appears to have largely resulted from MCI's efforts as broker. We thus affirm the trial court's finding of MCI's entitlement to a commission on the lease to D&D.

IV.

We next address which parties are liable to MCI for the commission under the open listing agreement on the ninety-nine-year lease to D&D. The trial court held all defendants jointly and severally liable to MCI. Defendants argue that the trial court erred in holding Strayer, Hankins, Hankins Properties, and Campus Properties jointly and severally liable for the commission. We agree.

The only parties to the open listing agreement were Urban Renewal and MCI. Strayer, Hankins, Hankins Properties, and Campus Properties were not parties to the agreement, did not sign the agreement, and did not guarantee its performance. Accordingly, Strayer, Hankins, Hankins Properties, and Campus Properties did not violate any contractual obligations and were not contractually liable for any commission due under the agreement. Moreover, in its amended complaint, MCI only alleged breach of contract against Urban Renewal. Therefore, the only parties liable to MCI for the commission on the ninety-nine-year lease are Urban Renewal and

21

Willingboro Renewal, its parent company. Accordingly, summary judgment should have been granted to defendants Strayer, Hankins, Hankins Properties, and Campus Properties dismissing MCI's claim for a commission on the ninety-nine-year lease.

Defendants further argue that the court erred in awarding a commission in the sum of $100,000 to MCI. The court provided the following explanation for the amount of damages it awarded to MCI:

> In terms of damages, I accept the two-million-dollar figure in the [D&D] operating agreement as sufficient evidence of an approximation of value for what was exchanged, and I apply the five percent commission figure to that. It's that simple, with respect to my findings.

Defendants argue that this calculation is flawed and lacks appropriate support in the record. We agree.

Article VII, § 7.01 of the operating agreement sets forth the respective capital contributions of Urban Renewal and Campus Properties to D&D, stating:

> Capital Contributions. (a) Simultaneously with the execution of this Agreement, [Renewal Willingboro] and [Campus Properties] shall contribute the cash, property and services set forth on Schedule A annexed hereto. [Campus Properties'] initial capital contribution shall be $96,173.00 representing ten percent (10%) of the estimated cost of the Strayer Build Out. [Renewal Willingboro] shall contribute $2,000,000.00 of capital to the Company, which the parties agree is the value of the ground lease of the Property being contributed by [Renewal Willingboro] to the Partnership plus [$]867,557.00 representing

22

> ninety percent (90%) of the estimated cost of
> the Strayer Build Out.

Accordingly, Renewal Willingboro contributed $2,867,000 to D&D, representing the value of the ground lease of the property ($2 million), and ninety percent (90%) of the estimated cost of the Strayer build-out ($867,000). Campus Properties contributed only $96,173 to D&D, representing the remaining ten percent of the estimated cost of the Strayer build-out. Thus, Renewal Willingboro contributed 96.75 percent of the total capital contributions to D&D, with Campus Properties contributing only the remaining 3.25 percent.

The operating agreement for D&D further provided that the participation interest of Renewal Willingboro was ninety percent and the participation interest of Campus Properties was ten percent. Accordingly, if the value of the ground lease was $2 million, the value of Campus Properties' ownership interest in the property would be $200,000, with Renewal Willingboro's interest being the remaining $1,800,000. Defendants argue that if we find that MCI is entitled to any commission, its commission should be five percent of only $200,000, not five percent of $2 million as computed by the trial court.

Notwithstanding the gross disparity in contribution level, the ninety percent participation interest of Renewal Willingboro,

and the fact that Willingboro Renewal was still the fee simple owner of the property leased to D&D, the trial court awarded a five percent commission on the entire $2 million value of the property listed in the operating agreement.

The court reached its decision on damages without conducting an evidentiary hearing. The court's decision did not include any analysis or consideration of the following pertinent facts: (1) the grossly disparate contributions of Renewal Willingboro and Campus Properties; (2) Renewal Willingboro retaining a fee simple ownership of the property leased to D&D; and (3) Renewal Willingboro holding a ninety percent participation interest in D&D, and thus transferred or exchanged only a small percentage of the value of the property. These facts should have been considered by the court in calculating the appropriate commission.

We recognize that no party requested an evidentiary hearing, and that the issues were presented to the court through cross-motions for summary judgment. Nonetheless, the damages issues require further proceedings on remand, with a plenary hearing to develop and determine any disputed material facts. Bruno v. Gale, Wentworth & Dillon Realty, 371 N.J. Super. 69, 76-77 (App. Div. 2004).

We therefore vacate the damage award of $100,000 and remand for the trial court to conduct further proceedings to determine

24

the appropriate amount of the commission under the open listing agreement.

V.

Finally, we address whether MCI is entitled to a commission under the open lease commission agreement or the doctrine of quantum meruit for the lease to Strayer. The trial court ruled that MCI was not entitled to a commission for the Strayer lease without specifically commenting on the equitable arguments raised by MCI.

In its cross-appeal, MCI argues that the trial court should have awarded it an additional $137,000 commission for the ten-year sublease Strayer entered into with D&D for the property. MCI concedes that it was not entitled to commission based on the open lease agreement with Urban Renewal. Rather, it contends that the court should have awarded a commission under either the theory of unjust enrichment or quantum meruit. We disagree.

A real estate broker is generally entitled to receive a commission "for the transfer of an interest in real estate, only if before or after the transfer the authority of the broker is given or recognized in a writing signed by the principal or the principal's authorized agent, and the writing states either the amount or the rate of commission." N.J.S.A. 25:1-16(b). "Transfer or sale" in this section is defined as the "transfer of an interest

25

in real or the purchase or sale of a business." N.J.S.A. 25:1-16(a). "Interest in real estate" is deemed to include a lease of real estate. N.J.S.A. 25:1-10.

Further, a broker who works under an oral agreement is entitled to a commission only if:

> 1) within five days after making the oral agreement and before the transfer or sale, the broker serves the principal with a written notice which states that its terms are those of the prior oral agreement including the rate or amount of commission to be paid; and
>
> (2) before the principal serves the broker with a written rejection of the oral agreement, the broker either effects the transfer or sale, or, in good faith, enters negotiations with a prospective party who later effects the transfer or sale.
>
> [N.J.S.A. 25:1-16(d).]

The Legislature enacted this revised version of the statute of frauds in 1995. Under the prior version, N.J.S.A. 25:1-9 stated:

> No broker or real estate agent selling or exchanging real estate for or on account of the owner shall be entitled to any commission for such sale or exchange, unless his authority therefor is in writing, signed by the owner or his authorized agent, or unless such authority is recognized in a writing or memorandum, signed by the owner or his authorized agent, either before or after such sale or exchange has been effected, and, in either case, the rate of commission on the dollar or the amount of the commission shall have been stated therein.

26                                                              A-5469-14T3

Any broker or real estate agent selling or exchanging real estate pursuant to an oral agreement with the owner of such real estate, who shall actually effect such sale or exchange before such oral agreement shall have been repudiated or terminated by the owner in writing as hereinafter provided, may recover from such owner the amount of commission on such sale or exchange, if the broker or agent shall, within five days after the making of the oral agreement and prior to the actual sale or exchange of such real estate, serve upon the owner a notice in writing, setting forth the terms of the oral agreement and stating the rate or amount of commission to be paid thereunder, and if the owner shall not have repudiated or terminated the oral agreement prior to the actual sale or exchange of the real estate.

[N.J.S.A. 25:1-9 (repealed L. 1995, c. 360, § 9 (eff. Jan. 5, 1996)).]

"Under both the old and new statutes, the broker can recover a commission if within five days after the oral agreement, the broker sends the owner a notice stating the terms of the agreement including the commission amount or rate, and if the owner does not repudiate or terminate the agreement prior to the actual sale of the property."  C&J Colonial Realty, Inc. v. Poughkeepsie Sav. Bank, F.S.B., 355 N.J. Super. 444, 472 (App. Div. 2002), certif. denied, 176 N.J. 73 (2003).

"N.J.S.A. 25:1-9, commonly referred to as the real estate broker's statute of frauds, '. . . represents a strong statement of public policy by the Legislature which cannot be ignored.'"

27

R.A. Intile Realty Co., Inc. v. Raho, 259 N.J. Super. 438, 454 (Law Div. 1992) (quoting McCann v. Biss, 65 N.J. 301, 309 (1974)). Strict compliance with the statute of frauds is "essential for a broker to recover a commission for the sale of real estate." C&J Colonial Realty, supra, 355 N.J. Super. at 473 (citing Tannenbaum & Milask, Inc. v. Mazzola, 309 N.J. Super. 88, 95 (App. Div. 1997)). Without a written agreement, an oral agreement complying with the requirements of N.J.S.A. 25:1-16(d) is the only means of satisfying the Statute of Frauds.

MCI does not claim an oral agreement existed. Nor did MCI send a notice to Urban Renewal pursuant to N.J.S.A. 25:1-16(d). Instead, MCI entered into the written lease commission agreement with Urban Renewal on September 15, 2010. The agreement expired on February 7, 2011. D&D and Strayer entered into the ten-year lease 486 days after the lease commission agreement expired. MCI entered into a second lease commission agreement with Urban Renewal on July 25, 2011, which expired on October 15, 2011. D&D and Strayer entered into the ten-year lease 236 days after the second lease commission agreement expired.

The open listing agreement expired on February 1, 2012, some 117 days before the lease between D&D and Strayer was entered into. Moreover, the ten-year sublease does not constitute a "sale

or exchange" or de facto "conveyance in fee" under the open listing agreement.

"[I]n a leasing, the broker's commission is not earned until the critical event, which ordinarily is the date the lease is signed." Feist & Feist Realty Corp. v. Dockside Urban Renewal Corp., 255 N.J. Super. 100, 104 (Law Div. 1992). Given the expiration of both the open listing and lease commission agreements before the ten-year sublease between D&D and Strayer was entered into, MCI is not contractually entitled to a commission for the sublease under either agreement.

We next address whether MCI is entitled to recover the reasonable value of its services relating to the Strayer sublease on an alternative theory of quantum meruit. Quantum meruit is a type of "quasi-contractual recovery for services rendered when a party confers a benefit with a reasonable expectation of payment." Weichert, supra, 128 N.J. at 437. The doctrine allows the party to recoup the reasonable value of services rendered. Id. at 438. As we recently explained:

> Quantum meruit is a form of quasi-contractual recovery and is wholly unlike an express or implied-in-fact contract in that it is imposed by the law for the purpose of bringing about justice without reference to the intention of the parties. The equitable remedy is applicable only when one party has conferred a benefit on another, and the circumstances

are such that to deny recovery would be unjust.

[*N.Y.-Conn. Dev. Corp. v. Blinds-To-Go (U.S.) Inc.*, 449 *N.J. Super.* 542, 556 (App. Div. 2017) (citations omitted).]

Under certain circumstances, a real estate broker can recover fees for services rendered even in the absence of an express or implied contract. As we explained in *Weichert*,

a broker seeking recovery on a theory of quantum meruit must establish that the services were performed with an expectation that the beneficiary would pay for them, and under circumstances that should have put the beneficiary on notice that the plaintiff expected to be paid . . . Courts have allowed brokers to recover in quantum meruit when a principal accepts a broker's services but the contract proves unenforceable for lack of agreement on essential terms—for instance, the amount of the broker's commission . . . [t]hus, a broker who makes a sufficient showing can recover fees for services rendered even absent express or implied agreement concerning the amount of the fee.

[*Weichert*, *supra*, 128 *N.J.* at 438 (citations omitted).]

However, if an express contract exists, a court cannot grant "relief regarding the same subject matter based on quantum meruit." *Kas Oriental Rugs, Inc. v. Ellman*, 394 *N.J. Super.* 278, 286 (App. Div.), *certif. denied*, 192 *N.J.* 74 (2007). There, the trial court awarded a commission for sales made after the termination of the contract on a quantum meruit basis. *Id.* at 288. We reversed,

holding that awarding a commission after the contract terminated was "inconsistent with the terms of [the] express contract" and therefore invalid. Ibid.

We recently reaffirmed this principle by holding a jury cannot award damages for quantum meruit if an express contract between the parties existed. Blinds-To-Go, supra, 449 N.J. Super. at 557.

> It has long been recognized, however, that the existence of an express contract excludes the awarding of relief regarding the same subject matter based on quantum meruit. An implied contract cannot exist when there is an express contract about the identical subject. The parties are bound by their agreement, and there is no ground for implying a promise.
>
> [Id. at 556 (internal quotation marks and citations omitted).]

Because an express contract existed regarding the identical subject matter, MCI cannot obtain relief based on quantum meruit. Kas Oriental Rugs, supra, 394 N.J. Super. at 286; Blinds-To-Go, supra, 449 N.J. Super. at 556. For example, in Moser v. Milner Hotels, Inc., 6 N.J. 278 (1951), the Court held:

> It is well settled that an express contract excludes an implied one. An implied contract cannot exist when there is an existing express contract about the identical subject. The parties are bound by their agreement, and there is no ground for implying a promise. It is only when the parties do not agree that the law interposes and raises a promise. When an express contract exists, there must be a rescission of it before the parties will be remitted to the contract which the law

implies, in the absence of the agreement which they made for themselves.

[Id. at 280-81 (quoting Voorhees v. Combs, 33 N.J.L. 494, 496-97 (E. & A. 1869)).]

See also Shalita v. Twp. of Washington, 270 N.J. Super. 84, 90-91 (App. Div. 1994) ("generally, the parties are bound by their agreement and there is no ground for an additional obligation where there is a valid unrescinded contract that governs their rights").  "The law continues to prohibit the enforcement of an implied contract or an implied provision that conflicts or is inconsistent with the parties' express contract, as we held in Moser."  Kas Oriental Rugs, supra, 394 N.J. Super. at 287.

Here, the ten-year sublease to Strayer was entered into after the lease commission agreement expired.  "Since Moser militates against the granting of a remedy based on a quantum meruit theory that is inconsistent with the terms of an express contract," MCI cannot obtain relief based on quantum meruit.  Id. at 288.

We further note that C&W served as the broker for the ten-year sublease from D&D to Strayer.  It is undisputed that C&W performed the services as broker on that transaction. "'Ordinarily, a broker who has been the effective cause of a transaction is entitled to the agreed commission[.]'"  George H. Beckman, Inc. v. Charles Reid & Sons, Inc., 44 N.J. Super. 159, 170 (App. Div. 1957) (quoting Restatement of Agency § 448(f)

(1933)). "[W]here a prospective tenant is produced by the broker and a negotiated lease results, the broker is deemed to be the efficient procuring cause of the lease, entitled to a commission." Feist & Feist Realty Corp., supra, 255 N.J. Super. at 104. Here, as the trial court correctly perceived, that did not happen with respect to MCI. MCI was not the "effective cause" of the sublease to Strayer. For this additional reason, MCI is not entitled to a commission under the open lease commission agreement.

For these reasons, the trial court properly granted summary judgment to defendants dismissing MCI's claim for a commission on the ten-year sublease to Strayer based on breach of contract or quantum meruit. This does not end our analysis, however.

In addition to its claims for breach of contract and quantum meruit, MCI's amended complaint also alleged legal theories of unjust enrichment, tortious interference with contract, breach of the implied covenant of good faith and fair dealing, aiding and abetting, and civil conspiracy. The court's oral decision did not discuss or analyze these additional claims. It did not set forth factual findings and correlate them to legal conclusions as to these additional claims. The court did not issue a written opinion stating findings of facts and conclusions of law on these discrete issues.

"[B]oth Rule 1:7-4 and Rule 2:5-1(b), specifically state that the court 'shall' set forth the facts and make conclusions of law to support the order or judgment." Allstate Ins. Co. v. Fisher, 408 N.J. Super. 289, 300-01 (App. Div. 2009). These requirements were not met here as to the discrete open issues. However, we note that the trial court's omission may have been understandable because the primary focus of the arguments to the motion judge instead concerned the key contractual issues.

Rule 2:10-5 provides that "[t]he appellate court may exercise such jurisdiction as is necessary to complete the determination of any matter on review." However, our original factfinding authority must be exercised sparingly and only in clear cases that are free of doubt. Tomaino v. Burman, 364 N.J. Super. 224, 234-35 (App. Div. 2003), certif. denied, 179 N.J. 310 (2004).

This is not a case where original jurisdiction will result in a complete determination of the matter on review. This appeal does not address a single, lingering issue. See Allstate, supra, 408 N.J. Super. at 302. There is no indication of a risk of perpetual litigation, and it does not appear that the exercise of original jurisdiction is necessary to avoid lengthy or burdensome litigation. See id. Accordingly, we decline to exercise original jurisdiction to determine these remaining open issues.

We remand for the trial court to consider MCI's claims of unjust enrichment, tortious interference with contract, breach of the implied covenant of good faith and fair dealing, aiding and abetting, and civil conspiracy. In doing so, we intimate no views on their resolution in the first instance.

VI.

In summary, viewing the pleading in a light most favorable to the respective nonmoving parties, we agree with the trial court that MCI is entitled to recover a commission from Urban Renewal and Renewal Willingboro under the open listing agreement for the ninety-nine-year lease of the property to D&D. We also agree that the other defendants are not liable to MCI for a commission for that transaction. We vacate the trial court's damages calculation, however, and remand the matter for the trial court to conduct proceedings, with a plenary hearing if fact-finding necessitates it, to re-determine the appropriate amount of the commission under the open listing agreement.

We concur with the trial court that MCI is not entitled to a commission for the ten-year sublease of the property to Strayer based on breach of contract or quantum meruit.

Lastly, we remand the matter for proceedings to determine MCI's additional claims of unjust enrichment, tortious

interference with contract, breach of the implied covenant of good faith and fair dealing, aiding and abetting, and civil conspiracy.

We direct the trial court to conduct a case management conference within thirty days to plan the remand proceedings and arrange for any additional briefing. The trial court has the discretion to reopen discovery, to the extent that it determines any of these unresolved issues warrant doing so.

We do not retain jurisdiction over the remanded issues. Any party aggrieved by the trial court's post-remand rulings may seek appellate review through a timely-filed new appeal.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION